Haidar BARBOUTI, Individually;
Highland Village Holding, Inc.;
and Por, Inc., Appellants,

v.

The HEARST CORPORATION d/b/a the
Houston Chronicle Publishing Com-
pany, and Jerry Urban, Appellees.

No. 01–94–00907–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

July 18, 1996.

Rehearing Overruled Aug. 12, 1996.

Thomas Herter, Houston, Steven J. Watkins, Houston, for Appellants.

Joel R. White and William W. Ogden, Houston, for Appellees.

Before OLIVER–PARROTT, C.J., and TAFT and O'CONNOR, JJ.

## OPINION ON REHEARING EN BANC

HUTSON–DUNN, Justice.

Haidar Barbouti, individually, Highland Village Holding, Inc., and Por, Inc. sued the Hearst Corporation d/b/a the Houston Chronicle Publishing Company, and Jerry Urban (to whom we shall sometimes collectively refer as "the Chronicle") for libel, based on two articles appearing in the Houston Chronicle newspaper in 1992. In 48 points of error, the plaintiffs attack the summary judgment the trial court granted for the Chronicle. On original submission, a panel of this Court reversed the summary judgment, and remanded the cause for trial; the Honorable Alice Oliver–Parrott, then Chief Justice of the Court, dissented. The Chronicle moved for panel rehearing, and after a member of the Court requested a poll, a majority of the full Court voted to rehear the case en banc. The Court sitting en banc now adopts the reasoning of the dissenting opinion on original submission, and affirms the summary judgment.

On February 21, 1992, the Houston Chronicle published an article, written by its reporter Jerry Urban, which was the first of the two articles forming the basis for appellants' suit. That article carried the headline, "Letter triggers new probe of Barbouti," and in its entirety, read:

The U.S. Defense Intelligence Agency is looking into possible ties between an owner of two Houston retail centers and a suspected Libyan terrorist, *congressional sources say.*

The agency is reviewing a letter *purportedly* written to Haidar Barbouti, an Iraqi who is principal owner of Houston's Windsor Plaza and Highland Village, and which mentions Abdullah al-Senoussi, a brother-in-law of Libya's Moammar Gadhafi.

The French government has named Senoussi, identified as Libya's chief foreign intelligence officer, as a suspect in the September 1989 bombing of a French UTA airline. French investigators have also said they had evidence Senoussi may have been involved in ordering the 1988 bombing of Pan Am Flight 103 over Scotland, which killed more than 400 people.

Barbouti and his family are subjects of an ongoing U.S. Customs investigation into their *alleged* involvement in the illegal export of dual-purpose (military-industrial) technology to Libya and Iraq.

U.S. authorities have named Barbouti's father, Dr. Ihsan Barbouti, as the primary contractor for a chemical weapons plant at Rabta, Libya.

*A spokesman for the DIA, a division of the Department of Defense, late Thursday could not confirm or deny the agency is reviewing the letter.*

*Tom McDade, an attorney representing Barbouti interests, said the document could be forged.*

Dr. Barbouti allegedly died on his 63rd birthday in July 1990, but some former business associates believe he feigned his death to avoid prosecution or even death by Israeli intelligence.

The Oct. 27, 1990, letter in question is from the Iraqi State Establishment for Textile to IBI Services LTD, Dr. Barbouti's former corporate headquarters in London. The letter is to the attention of Haidar Barbouti and Arie David, an attorney who represents the Barboutis.

The letter is signed on behalf of Raja Hassan Ali, an Iraqi national named by the U.S. Department of Justice as a defendant in the Banca Nazionale del Lavoro indictment in Atlanta.

The indictment alleges Ali and others conspired to defraud a loan program sponsored by the U.S. Department of Agriculture's Commodity Credit Corp. Ali was director general of the Economic Department of the Ministry of Industry and Military Production of the Republic of Iraq.

The brief letter says, "We expect the assistance that you promised to the Enterprise For Pesticide Production. Additional supplies of the raw materials will insure future funding by the foreign minister. Abudul [sic] Senoussi knows our requirements."

The Forward, a New York City weekly newspaper dealing with Jewish issues, reported in today's edition that Iraq's State Establishment For Pesticide Production is purportedly a front for Iraq's chemical weapons complex at Samarra.

The paper said the letter suggests Senoussi's duties at the time included supervising purchases of supplies for Libya's chemical-warfare program, and indicates Libya cooperated with Iraq to a greater degree than previously suspected.

(Emphasis added.) The article was accompanied by what was likely a file photo, a largely expressionless facial shot of Gadhafi.

The February 21 article was followed by a second, on March 6, 1992, also written by Urban. The headline to that second article was "Barbouti's son found liable in technology theft scheme," and in its entirety, read:

A state civil court jury Thursday found that a principal owner of two prominent Houston shopping centers conspired to steal technology for export to the Middle East.

The jury also found that Haidar Barbouti, a principal owner of Highland Village and Windsor Plaza, and other Barbouti interests damaged a Dallas man by more than $12 million.

The findings were the result of a lawsuit[1] by Pipeline Recovery Systems Inc. and its owner Bruce Munden, who said his company's pipe-coating technology was illegally stolen and exported to Libya and Iraq. The technology has military and nuclear as well as industrial uses.

Judge Scott Brister, fearing that jurors might be prejudiced, would not allow attorneys to mention that the technology was destined specifically for Libya and Iraq.

Attorneys representing Munden in the two-week trial would not comment, while Tom McDade, a Barbouti attorney, could not be reached.

Munden is a grand jury witness in an ongoing federal investigation of Haidar Barbouti, 24, his father, Dr. Ihsan Barbouti, and their corporate activities in the United States and Europe.

U.S. authorities, in court documents, say Dr. Barbouti was the primary contractor of a chemical weapons plant in Rabta, Libya.

Dr. Barbouti reportedly died on his 63rd birthday in July 1990, but some former business associates believe he feigned his death to avoid prosecution or death at the hands of Israeli intelligence agents.

The jury also found that several other people and entities conspired to defraud Munden, including Dr. Barbouti, IBI Industries, Inc., a Barbouti company; Highland Village Holding Inc., nominal owner of the shopping center, and Plaza on Richmond Inc., nominal owner of Windsor Plaza.

---

1. Cause no. 90–05365, in the 234th district court of Harris County, styled *Bruce Munden and Pipeline Recovery Systems, Inc. v. Haidar Barbouti et al.* (the Munden suit). The appeal is reported as *Barbouti v. Munden,* 866 S.W.2d 288 (Tex.App.—Houston [14th Dist.] 1993, writ denied).

The jury today is to consider punitive damages against Barbouti interests.

Appellants filed suit on February 19, 1993. On March 24, 1994, appellees moved for summary judgment, on four grounds, asserting that: (a) the articles were substantially true; (b) the articles were privileged; (c) the summary judgment evidence attached to the motion conclusively negated a finding of actual malice; and (d) appellees' "conspiracy to defame" theory was barred as a matter of law.[2] In support of their motion for summary judgment, appellees attached Urban's affidavit, along with certified copies of certain documents filed in the Munden suit; copies of documents filed in other court cases; copies of letters to Ihsan and/or Haidar Barbouti; and copies of newspaper articles about Ihsan and/or Haidar Barbouti, including the two that are the subject of this suit. Attached to appellants' response were (a) Haidar Barbouti's affidavit, along with copies of certain documents filed in other court cases, and copies of the two articles that are the subject of this suit; and (b) the affidavit of one of Haidar Barbouti's attorneys, authenticating attached excerpts from the transcript of Urban's oral deposition.

On May 23, 1994, the trial court signed its order granting summary judgment for appellees. This appeal followed.

■ Under TEX.R.CIV.P. 166a(c), a summary judgment is proper only when a movant establishes that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972). In a summary judgment proceeding, the burden of proof is on the movant, and all doubts about the existence of a genuine issue of fact are resolved against the movant. *Roskey v. Texas Health Facilities Comm'n,* 639 S.W.2d 302, 303 (Tex.1982). Once the movant has established a right to a summary judgment, the burden shifts to the nonmovant. The nonmovant then must respond to the motion for summary judgment and present to the trial court any issues that would preclude summary judgment. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671,

678 (Tex.1979); *United Business Mach. v. Entertainment Mktg., Inc.,* 792 S.W.2d 262, 264 (Tex.App.—Houston [1st Dist.] 1990, no writ).

■■ On review of a summary judgment, this Court will take all evidence favorable to the nonmovant as true. *MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986); *Goldberg v. United States Shoe Corp.,* 775 S.W.2d 751, 752 (Tex.App.—Houston [1st Dist.] 1989, writ denied). Every reasonable inference will be indulged in favor of the nonmovant, and any reasonable doubt will be resolved in its favor. *Continental Casing Corp. v. Samedan Oil Corp.,* 751 S.W.2d 499, 501 (Tex.1988); *Goldberg,* 775 S.W.2d at 752. The movant has the burden of showing that there are no genuine issues of material fact, and that it is entitled to judgment as a matter of law. *MMP,* 710 S.W.2d at 60; *Goldberg,* 775 S.W.2d at 752.

■ Summary judgment is proper for a defendant if its summary judgment proof establishes, as a matter of law, that there exists no genuine issue of material fact concerning one or more of the essential elements of the plaintiff's cause of action, *Goldberg,* 775 S.W.2d at 752, or if it establishes all elements of an affirmative defense as a matter of law, *Munoz v. Gulf Oil Co.,* 693 S.W.2d 372, 373 (Tex.1984).

■ Where, as here, a trial court's order granting summary judgment does not specify the grounds relied on for its ruling, the summary judgment will be affirmed on appeal if any of the grounds presented in the motion is meritorious. *Insurance Co. of N. Am. v. Security Ins. Co.,* 790 S.W.2d 407, 410 (Tex.App.—Houston [1st Dist.] 1990, no writ).

In points of error one through six, appellants contend that the summary judgment was erroneous because appellees did not meet their burden, as movants seeking summary judgment, to prove as a matter of law that the two articles in question were each substantially true.

■ Simply stated, a showing that a defamatory communication was substantially

---

**2.** The plaintiffs' allegations in their original petition focus on two newspaper articles that allegedly defame Haidar Barbouti and do not mention the corporate plaintiffs. The Chronicle's motion for summary judgment does not address the corporate plaintiffs' ability to recover damages for the alleged defamation of Haidar Barbouti.

true will defeat a libel cause of action. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516, 111 S.Ct. 2419, 2432–33, 115 L.Ed.2d 447 (1991); *McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex.1990); *Crites v. Mullins*, 697 S.W.2d 715, 717 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). To determine substantial truth, we are to "consider whether the statement was more damaging to the plaintiff's reputation, in the mind of the average reader, than a true statement would have been." *McIlvain*, 794 S.W.2d at 16. Measured against that standard, the articles, although not 100 percent accurate in every detail, were substantially true.

In his affidavit, Urban first testified to his subjective belief in the truth of every fact stated in the two articles, both at the time he gave the affidavit and at the time the articles had been published. He said that that belief was based on his personal review of "court records and interviews with several sources," and proceeded to describe the information on which he had relied, for each statement in each article.[3]

### The March 6 article.

**Jury findings concerning conspiracy to steal technology for export.**

■ The statement in the March 6 article that "A state civil court jury Thursday found that a principal owner of two prominent Houston shopping centers conspired to steal technology for export to the Middle East" was, he said, based on (a) the jury's answer in the Munden suit that appellants "conspired to obtain by fraud or theft Bruce Munden's 20 percent interest in foreign situ pipe coating operations" and (b) the allegations of Munden's fourth through eleventh amended petitions in that suit, that appellants had attempted to steal chemicals, technology and the proprietary process that he and his company developed in order to export illegally the stolen materials and technology to Libya and Iraq. Urban attached the eleventh amended petition, which does allege that appellants conspired to and did attempt to make such illegal exports.

The controverting portion of Barbouti's affidavit states,

> With respect to the March 6, 1992, article, it is absolutely false that "a state civil court jury Thursday found that a principal owner of two prominent Houston shopping centers conspired to steal technology for export to the middle east." Nowhere in the court's charge or in the jury's verdict was there a finding that I conspired to steal technology or to export technology to the middle east for any purpose.

Barbouti's controversion shows that the statement in question in Urban's affidavit was less than 100 percent accurate. The statement was, however, substantially true, in that, in a suit where a conspiracy to steal an interest in a company owning technology for export to the middle east was alleged, the jury found that a conspiracy to steal technology existed. Barbouti's controversion does not undermine the substantial truth of the statement in question.

■ The statement in the March 6 article that "The findings were the result of a lawsuit by Pipeline Recovery Systems Inc. and its owner Bruce Munden, who said his company's pipe-coating technology was illegally stolen and exported to Libya and Iraq" was, Urban said, based on statements Munden made in his pleadings and in court. Although Munden's eleventh amended petition contains no statements to the effect that his company's technology was *actually* stolen and exported to Libya and Iraq, it does, as noted, contain statements that appellants had both conspired to and attempted to do so.

The controverting portion of Barbouti's affidavit states

> By the time these specific articles were published, at least one court, the United

---

**3.** Urban's affidavit did not specifically address the basis for the second paragraph of the March 6 article, which states that "The jury also found that Haidar Barbouti, a principal owner of Highland Village and Windsor Plaza, and other Barbouti interests damaged a Dallas man by more· than $12 million." The summary judgment record includes a copy of the jury's verdict in the Munden suit; the jury found that Munden and

his company·had suffered $2 million in damages when Ihsan Barbouti or IBI Industries, Inc. failed to comply with an agreement to fund specified domestic operations, and had suffered $10.6 million in damages as a result of a conspiracy in which all three appellants participated. Where, as here, it is uncontroverted, that evidence is sufficient to show the substantial truth of the statement in question.

States District Court for the Southern District of Oklahoma, had directed a verdict against Moshe Tal, at whose trial Bruce Munden appeared and testified and who was represented by Mike Johnston. The court found that there was no evidence to support Tal's claims or to create fact issues for a jury. Tal's case was virtually identical to the theory put forward by Mr. Munden. This directed verdict occurred in the summer of 1991, well before publication of the subject articles.

The suit to which this passage refers is *TK–7 Corporation, Tal Technologies and Moshe Tal v. Ihsan Barbouti, Haidar Barbouti, IBI Inc., a New York Corporation, IBI Holding Incorporated, a Delaware Corporation, and 1600 Pacific Ave. Corp., a Delaware Corporation* (the Oklahoma suit). That the trial court directed a verdict against the plaintiffs in the Oklahoma suit, however, does not raise a fact issue concerning the substantial truth of the pleading and proof of the allegations in the Munden suit; the two suits concerned different overt acts, directed at different objectives—fuel additive formulas on the one hand and pipe coating technology on the other. Appellees' statements that Munden had said his company's pipe-coating technology was *actually* stolen and exported illegally to Libya and Iraq were substantially true; according to the summary judgment evidence, Munden had indeed said that appellants had both conspired to and attempted to steal that technology for such illegal export.[4]

### Military and industrial uses.

■ The statement in the March 6 article that "The technology has military and nuclear as well as industrial uses" was, Urban said, "made directly to me by Bruce Munden" who "described . . . in detail several of the military and nuclear uses of the technology as well as some of its industrial uses." The controverting portion of Barbouti's affidavit is conclusory, and insufficient; it states

merely that that statement is "false in and of itself."

### Motion in limine.

■ The statement in the March 6 article that "Judge Scott Brister, fearing that jurors might be prejudiced, would not allow attorneys to mention that the technology was destined specifically for Libya and Iraq" was, Urban said, based on (a) Urban's personal knowledge that Haidar Barbouti's attorneys filed a motion in limine alleging that allegations that Munden's technology had been stolen specifically for export to Libya and Iraq were unduly prejudicial, and (b) Judge Brister's oral rulings on the motion in limine. The copy of the motion in limine and the excerpts from the statement of facts from the hearing on that motion which are attached to appellees' motion for summary judgment bear Urban out on these matters; the motion in limine shows that the trial court was asked to instruct all attorneys in the case not to make reference in any way to, among other matters, any testimony or other evidence that Ihsan or Haidar Barbouti or any other member of the Barbouti family or any corporate defendant was engaged in trading goods, or selling services, or conducting any other activity with Libya or Iraq and/or Moammar Gadhafi or Saddam Hussein. The handwritten letter "G" appears next to this particular request, indicating that the motion in limine was granted with respect to such evidence, as do the excerpts from the statement of facts from the hearing on the motion in limine.

Barbouti's affidavit does not merely fail to controvert the statement in question; it affirmatively agrees with Urban's affidavit on this point. Barbouti states that, in the Munden suit, "[t]he court specifically excluded references to Libya and Iraq[.]"

---

4. We note that Barbouti also asserted in his affidavit that "the implication in" the March 6, 1992, article that the technology was indeed actually destined specifically for Libya or Iraq is false because "there was never any evidence of that in the Munden case or in any other matter followed by Jerry Urban." That testimony does not tend to show that the statement was not substantially true, precisely because the plaintiffs in the Munden suit were prohibited—due to the possibility that the jury would decide the case based on bias or prejudice against Libyans, Iraqis, or those acting in concert with them—from eliciting any such evidence that may have existed. Barbouti's testimony that there was never any such evidence "in any other matter followed by Jerry Urban" does not specifically identify any particular suit, and does not suffice to raise a genuine issue of material fact, where Urban said that the statement was based on the pleadings and the answers to a jury question *in the Munden suit.*

**Comment by attorneys in the Munden suit.**

 The statement in the March 6 article that "Attorneys representing Munden in the two-week trial would not comment, while Tom McDade, a Barbouti attorney, could not be reached" was, Urban said, based on his own request for a comment from Munden's attorneys and his own effort to telephone McDade at his office by telephone, where Urban had reached him several times before. Nothing in Barbouti's affidavit controverts either of these statements in Urban's affidavit.

**Munden's status as a grand jury witness in federal investigation of Barbouti.**

 The statement in the March 6 article that "Munden is a grand jury witness in an ongoing federal investigation of Haidar Barbouti, 24, his father, Dr. Ihsan Barbouti, and their corporate activities in the United States and Europe" was, Urban said, based on public court documents. To show the existence of such an investigation, Urban's affidavit then referred specifically to two such documents attached to appellees' motion for summary judgment: (a) an undated instrument styled "claim of law enforcement privilege" executed by Charles S. Harrison, the acting special agent in charge of the Customs office in Houston, in connection with the Munden suit, which said, in pertinent part, that in that office "there is currently an ongoing law enforcement investigation of the activities of Ihsan Barbouti, Haidar Barbouti, their agents, individuals and/or entities controlled, associated or otherwise related to Ihsan Barbouti and/or Haidar Barbouti"; and (b) a similar instrument executed by Carol Hallett, the Commissioner of the United States Customs Service, and making the same statement, but which, unlike the other, was in the form of an affidavit and dated July 19, 1991. Finally, to support the portion of the article asserting that Munden was a grand jury witness, Urban's affidavit referred to a copy of a grand jury subpoena for Munden attached to appellees' motion for summary judgment; the subpoena summoned Munden to testify before a grand jury of the U.S. District Court for the Southern District of Florida on November 12, 1991, and commanded him to bring documents

regarding Product Ingredient Technology (PIT), Louis Champon, Hidar [sic] Barbouti, Ishan [sic] Barbouti or Arie David, and relating to the storing, using, shipping, processing and possession of cyanide, hydrogen cyanide, ferric ferrocyanide and other related chemicals and/or related technology for export, and any financial records for transactions related thereto from 1/1/88 to date.

The controverting portions of Barbouti's affidavit state (a) "I have never received any indication from any agency of a state or federal government that I have been the target of a 'government investigation' or a 'grand jury proceeding,' nor have any of my 'companies' received such information"; (b) "The government's Statement of Interest filed in [the Oklahoma suit] ... was filed in March 1991 and withdrawn later that year at or before the time of the trial, at which time the government stated that there was not found to be any government or national security interest in the matter. A true copy of the withdrawal is attached ...[.] The affidavits of Charles S. Harrison and Carol Hallett ... were also withdrawn prior to [the February 21, 1992 and March 6, 1992 articles]."; and (c) "the 'Statement of Interest' refers only to my late father, Ihsan Barbouti, and in no way makes any statements about me or any activity associated with me."

Barbouti's affidavit does not suffice to raise a fact issue about the substantial truth of the statement in question. Barbouti's not having received any information or indication from any agency concerning an investigation does not controvert the statement in the article. Second, the instrument Barbouti describes as a "withdrawal" of the Statement of Interest is more accurately described as a report of the findings that resulted from the assessment which the government had requested, in the Statement of Interest, to be allowed to make before certain information was produced to the defendants in the Oklahoma suit. That instrument does not show that any federal investigation was no longer "ongoing"; instead, the findings it reports show that there is potential for such an in-

vestigation to occur in connection with the export of the data that was the subject of the Oklahoma suit.[5] Moreover, for purposes of substantial truth, it would make no difference in the mind of an ordinary reader whether there was an original investigation followed by another investigation distinct from the first, or instead there was a single continuing investigation; no ordinary reader would attach more opprobrium to the latter fact, if true, than the former. Finally, although the Statement of Interest refers only to Ihsan Barbouti by name, that instrument also shows that Haidar Barbouti was a defendant in the Oklahoma suit. In the absence of additional information about the reasons Haidar Barbouti was a defendant in that suit, the fact that the Statement of Interest does not refer to him by name does not, standing alone, tend to prove that Haidar Barbouti was not the subject of any federal investigation as set forth in the Harrison and Hallett instruments and the grand jury subpoena to which Urban's affidavit referred.

**Barbouti's father as primary contractor of Rabta, Libya plant.**

 The statement in the March 6 article that "U.S. authorities, in court documents, say Dr. Barbouti was the primary contractor of a chemical weapons plant in Rabta, Libya" was, Urban said, based on an instrument filed by the Department of Justice in the Oklahoma suit.[6] Attached to that instrument

was a copy of Ihsan Barbouti's answers to requests for admissions in that same suit, which included his statement that, "I admit that I was the designer and prime contractor for the Rabta Libya Complex, except for the pharmaceutical plant." Without controversion, that evidence was sufficient to establish the substantial truth of the statement in question, as a matter of law. And that evidence was uncontroverted. No portion of Haidar Barbouti's affidavit denied his father's involvement in the construction of that plant; instead, Haidar Barbouti controverted a statement that did not appear in the article, by denying that *Haidar* Barbouti had ever "participated in the construction or agreement to construct the chemical weapons plant at Rabta, Libya." Appellants did not successfully raise a fact issue with respect to the statement in question.

**Barbouti's father as having feigned his own death.**

 The statement in the March 6 article that "Dr. Barbouti reportedly died on his 63rd birthday in July 1990, but some former business associates believe he feigned his death to avoid prosecution or death at the hands of Israeli intelligence agents" was, Urban said, based on conversations in which his former business partners—including Bruce Munden, Arthur Valentz and Moshe Tal—had made that very statement directly to Urban.

5. The report summarized the findings of the government as follows:
 (1) The Department of Commerce has determined that the TK–7 formulas constitute technical data controlled for export by [the U.S. Department of] Commerce under general license "GTDR" for restricted technical data. However, for the reasons set forth below, Commerce does not object to the disclosure of the TK–7 formulas in accordance with the parties' agreed-upon protective order [which provided that disclosure of the formulas would be limited to defendants' counsel]. The parties and counsel should be aware, however, that *any transmission of this data to Libya remains subject to the provisions of the Export Administration Regulations [EAR]*.
 (2) Commerce has also found that the TK–7 fuel additives are not among those chemical and petroleum-related commodities controlled for national security purposes on the EAR's Commodity Control List but *are re-*

*stricted from export solely for foreign policy purposes.*
 (3) The Department of State, in consultation with the Department of Defense, has determined that the TK–7 formulas are not among the defense articles or services listed on the United States Munitions List whose export is controlled by State.
 For these reasons, the United States does not object to the disclosure of the TK–7 fuel additive chemical formulas in accordance with the terms of the parties'. agreed-upon protective order.
(Emphasis added.)

6. The instrument was styled "Statement of Interest of the United States of America," and requested that certain information ordered produced to the defendants in that suit first be provided to the government for an assessment whether any applicable law or regulation restricted its disclosure to the defendants in that suit.

The controverting portion of Barbouti's affidavit states,

> My father died in a London hospital on July 1, 1990. I was present at his funeral. Upon information and belief, my mother, brother and sister viewed his body. This, together with a copy of the death certificate, was known or should have been reasonably known to or in the possession of Mr. Urban prior to the time he wrote the February 21, 1992 article.

Nothing in the controverting portion of Barbouti's affidavit reflects personal knowledge on Barbouti's part of any facts that tend to show that Urban's statement was not substantially true. Barbouti did not raise a fact issue with respect to the substantial truth of the statement in question.

### Jury findings on conspiracy.

■ The statement in the March 6 article that "The jury also found that several other people and entities conspired to defraud Munden, including Dr. Barbouti, IBI Industries, Inc., a Barbouti company; Highland Village Holding Inc., nominal owner of the shopping center, and Plaza on Richmond Inc., nominal owner of Windsor Plaza" was, Urban said, based on the jury's verdict in the Munden suit. The jury's answers to questions six and nine support all parts of the statement in question, except for the characterization of the latter two entities as "nominal owners" of the respective properties. That portion of the statement was, however, irrelevant to the libel suit; any fact issue about it was not material, and did not preclude granting summary judgment for appellants.

### Jury scheduled to consider punitive damages.

■ The statement in the March 6 article that "The jury today is to consider punitive damages against Barbouti interests" was, Urban said, based on his "own personal observation that the jury was scheduled to

begin deliberations concerning punitive damages ... on the day after the March 6, 1992 article was written." Barbouti's own affidavit supplies additional proof concerning Urban's basis for knowledge, by elaborating on the nature of his "personal observation"; Barbouti said that "Jerry Urban ... has avidly and continuously followed all litigation between myself and those persons represented by Brian Bro and Michael Johnston (of Oklahoma) since first filed in 1989." The record shows that Bro, with Johnston as co-counsel, filed the eleventh amended petition for Munden and his company in the Munden suit. Johnston also represented the plaintiffs in the Oklahoma suit. Barbouti also said that "Jerry Urban attended a great number of court proceedings in the litigation involving me, as well as in the IBI Industries, Inc. bankruptcy proceeding[.]" Finally, Barbouti's affidavit is consistent with Urban's on this point; Barbouti said that "the subject articles [were] published so as to immediately precede the beginning of the Munden trial and to appear on the day that the Munden jury was to consider punitive damages." Another statement elsewhere in Barbouti's affidavit shows that Barbouti meant that the February 21, 1992 article immediately preceded the beginning of the Munden trial and that the March 6, 1992 article appeared on the day that the Munden jury was to consider punitive damages.[7] With respect to this statement in the March 6, 1992 article, there is no controverting portion of Barbouti's affidavit.

### March 6 article—conclusion.

Barbouti concluded the portion of his affidavit addressed to the truth of the March 6, 1992 article by saying

> The "gist" of the March 6, 1992 article is that a state civil court jury specifically found that I conspired to steal technology for export to Libya and Iraq and that there was evidence before the court that

7. That statement is:
> One very telling aspects [sic] of the motive of the Chronicle and Mr. Urban in publishing these articles is that the first article occurred on the eve of the trial in *Bruce Munden, et al. v. Haidar Barbouti, et al.* in front of Judge Scott

> Brister. The second article appeared the morning after a jury verdict in that case and on the day that, in Jerry Urban's words, the jury was "to consider punitive damages against Barbouti interests."

this technology was military and nuclear in nature and bound for Libya and Iraq. The article also implies that Munden, as a grand jury witness in an ongoing federal investigation of my purported activities which the article implies were conducted in connection with my late father, Dr. Ihsan Barbouti, and were involved with the construction of "a chemical weapons plant in Rabta, Libya," was vindicated by state court jury and awarded damages. All of this is false.

The record does not support this assessment. The statements in the March 6, 1992 article, individually and as a whole, were substantially true.

### The February 21 article.

Concerning the February 21, 1992 article, Urban first reiterated his subjective belief in the truth of every fact stated in the article, both at that time and at the time the article had been published.

### Congressional sources' account of Defense Intelligence Agency investigation.

 The statement constituting the first paragraph of the February 21 article—that "The U.S. Defense Intelligence Agency is looking into possible ties between an own-

er of two Houston retail centers and a suspected Libyan terrorist, *congressional sources say* " (emphasis added)—was, on its face, based on information received from third parties. In his affidavit, Urban described the basis for that statement. First, he said that "I have long been aware of numerous federal investigations into alleged criminal activities of Haidar Barbouti, his father, Dr. Ihsan Barbouti, and companies owned or controlled by Haidar and Ihsan Barbouti, including not only the Department of Defense investigation referred to in the February 21, 1992 article, but also criminal investigations by the United States Custom Service," and then cited six exhibits to the Chronicle's motion for summary judgment.[8] Urban further said the statement was also based on the letter described in the article, and that he personally observed that the letter was filed as a court record in civil litigation against each of the appellants. None of the evidence to which Urban refers concerns the Defense Intelligence Agency, and the only reference to the Department of Defense is conclusory. A review of the argument offered in support of points of error one through six shows, however, that appellants raise only three specific complaints about the February 21 article.[9] Only one of

---

8. Those exhibits include four items described above: (a) the grand jury subpoena summoning Bruce Munden to testify in the Southern District of Florida on November 12, 1991; (b) the government's Statement of Interest filed in the Oklahoma suit; (c) the undated "claim of law enforcement privilege" executed by Charles S. Harrison in connection with the Munden suit; and (d) the similar instrument executed by Carol Hallett. The remaining two exhibits are (e) a motion to quash a subpoena served on a Houston-based customs agent in a suit brought by Haidar Barbouti and others in state district court in Harris County, and (f) the complaint in a forfeiture action in the Southern District of New York, alleging Ihsan Barbouti's participation in violations of restrictions upon exports to Libya.

9. Those complaints do not include any assertion that Urban failed, in his affidavit, to show how he was competent to testify regarding the existence of any investigation or investigations of Barbouti. To the extent that appellants raise such a complaint, it is embodied in their point of error 45, in which appellants assert that Urban's affidavit (a) contains untrue statements, (b) contains statements of unsubstantiated opinion, and (c) contains statements not made on personal

knowledge. We overrule point of error 45, because the argument offered in support of points 45 and 46 shows that the statements to which point 45 refers are the same 14 statements enumerated in point 46. Appellants cite authority in support of these points; however, they do not, in any portion of their briefing supporting these points, apply the authorities cited to the facts of this case. Instead, they merely repeat, in conclusory fashion, the assertions set forth in points 45 and 46, that Urban's affidavit consists of untrue statements, unsubstantiated opinion, legal conclusions, and statements which are not based on personal knowledge. The mere citation of authority without discussion of facts showing error does not comply with the requirements of TEX. R.APP.P. 74(f). *See Maranatha Temple, Inc. v. Enterprise Products Co.*, 893 S.W.2d 92, 106 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (purely conclusory statement, accompanied by a citation, not a sufficient argument under rule 74). For these same reasons, we overrule point of error 46 as well.

We would not, in connection with points of error one through six, revisit the question expressly raised and inadequately briefed in point of error 45. Urban's familiarity with the contents of the exhibits to which his affidavit

those complaints is addressed to the statement constituting the first paragraph of the February 21 article: appellants complain that appellees affirmatively reported that the DIA was reviewing the letter, but in fact relied on a rumor, in that a spokesman for the DIA could not confirm or deny that the agency was reviewing the letter. That statement, by expressly relying on what "congressional sources say," did not attempt to characterize its assertion that the DIA was reviewing the letter as based on anything much more than a "rumor." We do not, as the dissent states, hold that that attribution to unnamed congressional sources operates to absolve the Chronicle of liability for publishing the article; instead, the significance of that attribution is that, because it is present in the February 21 article, the record does not support the factual premises of appellants' complaint. Accordingly, appellants' complaint fails, in turn, to undermine the substantial truth of appellees' report.

### The purported Raja Hassan Ali letter.

 The statement in the February 21 article that "The agency is reviewing a letter *purportedly* written to Haidar Barbouti, an Iraqi who is principal owner of Houston's Windsor Plaza and Highland Village, and which mentions Abdullah al-Senoussi, a brother-in-law of Libya's Moammar Gadhafi"

> refers (see footnote 8, *supra*) supports his statement that he had "long been aware" of numerous federal investigations of Haidar Barbouti and his father, Dr. Ihsan Barbouti, and companies they owned or controlled. Those exhibits show that federal agencies other than the DIA were investigating Barbouti. A statement that the DIA was investigating Barbouti was not more damaging to his reputation, in the mind of the average reader, than a statement that he was being investigated by a federal grand jury, the U.S. attorney general, and/or the U.S. customs service.

10. That letter, dated 27 October 1990, was on stationery purporting to be that of the Iraq State Establishment for Textile; was marked *"PERSONAL"*, and was addressed to the attention of Haidar Barbouti and Arie David at a London office of IBI Services LTD. In its entirety, the letter said:
> GENTLEMEN:
> We expect the assistance that you promised to the Enterprise For Pesticide Production.
> Additional supplies of the raw materials will insure future funding by the foreign minister.

(emphasis added), is supported by the letter itself, attached to appellees' motion for summary judgment, and which, in his affidavit, Urban said he personally observed was filed as a court record in civil litigation against each of the appellants.[10] We note that the February 21 article did not assert that the letter in question was indeed written to Haidar Barbouti—only that, on its face, it *purported* to be written to him.[11] That same evidence also supports the ninth and 12th paragraphs of the February 21, 1992, article, and, in addition, shows that the statement in the 10th paragraph that "The letter is signed on behalf of Raja Hassan Ali" is substantially true; the letter certainly *purported* to be signed on behalf of Raja Hassan Ali.

The opposing portion of Barbouti's affidavit states that
> This letter [to which the February 21, 1992 article refers] does not exist. I never received any such letter, I do not know nor have I ever met its purported sponsor or author Raja Hassan Ali, I do not know nor have I ever met Abdullah al-Senoussi. Defendant Urban refused in deposition to disclose the source of the letter (Urban dep. p. 247) or what efforts he made to authenticate it or determine whether it was a forgery or fabrication (Urban dep. p. 248), in each case relying on and refusing to disclose a "confidential source." [12]

> Abdul Senoussi knows our requirements.
> Regards,
> /s/
> FOR RAJA HASSAN ALI
> cc: Abdul Senoussi, Jawahira
> Al–Kadhi, Water Engineering Trading
> Meda Project Coordinator

11. For that reason, we disagree with the dissent: there was no need here for a sponsor to verify that the letter was what it purported to be, because the only statement the Chronicle made about that letter in the February 21 article concerned *only* what the letter *purported* to be. According to the summary judgment evidence, the statement that the letter purportedly was written to Haidar Barbouti is substantially true; the same evidence supports the substantial truth of the other assertions embodied in that same sentence of the February 21 article.

12. Barbouti continues, saying,

> I have never, as stated in the letter, promised any assistance to the "enterprise for pesticide

Appellants had presented a copy of the letter in question along with their motion for summary judgment; accordingly, Barbouti's denial was insufficient to raise a fact issue concerning the physical existence of the letter. The balance of this portion of Barbouti's affidavit merely, first, controverts statements which do not appear in the February 21, 1992, article; then describes Urban's refusal to provide certain discovery—which, standing alone, does not raise any of the fact issues that that discovery, if compelled, *might* have raised. Barbouti failed to demonstrate the existence of any fact issue concerning the substantial truth of the statement in question.

**The account of the New York weekly article.**

■ The statements in the last two paragraphs of the February 21 article were, Urban said, accurately quoted from the New York newspaper "The Forward." While the statements appear to have instead been paraphrases, Barbouti did not in his affidavit testify that Urban's description of the report in The Forward was inaccurate; he specifically stated that "I have no knowledge of the article contained in The Forward." Accordingly, the summary judgment evidence shows that the statements in those two paragraphs of the February 21 article were substantially true.

**Paragraphs of February 21 article not separately addressed in the Urban affidavit.**

Urban did not, in his affidavit, separately address all of the statements in the fourth through 12th paragraphs of the February 21, 1992, article in sequence. However, the portions of Urban's affidavit that address similar statements in the March 6, 1992, article also support the statements Urban made in the fourth, fifth, and eighth paragraphs of the February 21, 1992, article; and as noted

above, the same evidence that supports the statements in the second paragraph of the February 21, 1992, article also supports the ninth and 12th paragraphs, and a portion of the 10th paragraph.

■ The statement in the 10th paragraph of the February 21 article that "Raja Hassan Ali [was] an Iraqi national named by the U.S. Department of Justice as a defendant in the Banca Nazionale del Lavoro indictment in Atlanta" and the description of the indictment in the 11th paragraph were, Urban said, based on his personal review of the indictment in that case. A certified copy of a portion of that indictment was attached to appellants' motion for summary judgment. It shows that (a) Raja Hassan Ali was named by the U.S. Department of Justice as a defendant in the Banca Nazionale del Lavoro indictment in Atlanta; (b) the indictment alleges Ali and others conspired to defraud a loan program sponsored by the U.S. Department of Agriculture's Commodity Credit Corp.; and (c) the indictment alleges Ali was director general of the Economic Department of the Ministry of Industry and Military Production of the Republic of Iraq. Although the excerpt from the indictment does not expressly state that Raja Hassan Ali was an Iraqi national, and does not show that Ali was, in fact, director general of the Iraqi ministry, as alleged; the excerpt is sufficient, in the absence of controverting evidence, to show that these statements in the 10th and 11th paragraphs of the February 21, 1992, article were substantially true. Barbouti did not present any evidence that controverted any of these statements; instead, he said, "In addition to never having met or dealt with or been acquainted with Raja Hassan Ali, I have had no dealings with the Banca Nationale [sic] del Lavoro (BNL) or participated directly or indirectly in the ... transactions which led to the BNL indictment[.]"

production" or agreed to supply raw materials per the requirements of such enterprise or anyone by the name of Senoussi, nor have I or any corporation with which I have been associated have [sic] ever received any funding from any foreign minister of Iraq or any agency of the government of Iraq.

This portion of Barbouti's affidavit does not controvert any statement in the February 21, 1992, article; and instead controverts statements that neither article ever undertook to make. The article never vouched for the truth of the contents of the letter; instead, it merely reported that the letter existed and told what that letter, correctly or not, said on its face.

██ Urban asserted, in conclusory fashion, that he accurately reported, in the February 21 article, McDade's statement that "the document could be forged." The controverting portion of Barbouti's own affidavit begins, in similarly conclusory fashion, by saying that Urban knew at the time that the February 21, 1992, article was written and published that "my position was that the document in question was a forgery and a fabrication." The balance then says, "To say that 'Tom McDade, an attorney representing Barbouti interests, said the document could be forged' substantially misrepresents my position by implying that there is a possibility that the document might be authentic." Barbouti does not controvert that the statement was an accurate account of what was said by his attorney. Barbouti's controversion simply does not undermine the substantial truth of the statement in question.

██ Urban did not address the basis for his statement that "A spokesman for the DIA, a division of the Department of Defense, late Thursday could not confirm or deny the agency is reviewing the letter." Barbouti's affidavit, however, shows that he did not dispute the truth of this statement; Barbouti accepted that statement, and used it to support his own assertion that Munden and his attorneys were the appellants' sole source for appellants' reports of government investigations touching on Barbouti: "Their sole source was Munden, and his lawyers. This is admitted by Jerry Urban in the February 21, 1992, article when he says that the DIA 'could not confirm or deny the agency as reviewing the letter.' "

**Assertions about Senoussi's background.**

██ Appellants' remaining two specific complaints about the February 21 article are addressed to another of the statements in the February 21, 1992 article, with respect to which the proof is also problematic. The article states that

> The French government has named Senoussi, identified as Libya's chief foreign intelligence officer, as a suspect in the September 1989 bombing of a French UTA airline. French investigators have also said they had evidence Senoussi may have

been involved in ordering the 1988 bombing of Pan Am Flight 103 over Scotland, which killed more than 400 people.

This statement was, Urban said, based on reports in the Washington Post and the New York Times. Urban swore in his affidavit to the authenticity of certain newspaper and magazine articles attached to appellants' motion for summary judgment; included among them are articles from those two publications, but none of the Washington Post or New York Times articles or any of the others supports this statement in his affidavit. Appellants do not, however, assert that this statement is inaccurate. Instead, appellants complain, first, that appellees alleged a link between appellant Haidar Barbouti and Abdullah al-Senoussi on the basis of the letter mentioned in the second paragraph of the article, even though the letter shows on its face that Abdullah al-Senoussi is not the author; and second, that the gist of the article is that appellant Haidar Barbouti is connected with Moammar Gadhafi and his brother-in-law Abdullah al-Senoussi.

Appellees reported a *possible* link between appellant Haidar Barbouti and Abdullah al-Senoussi, on the basis of a document which they characterized as a letter *purportedly* written to Barbouti and which they characterized, correctly, as *mentioning* Senoussi. That Senoussi was not the author of the letter does not undermine the substantial truth of the report of the link between the two which the letter, if genuine, may indicate; the third-party author of the letter refers to Senoussi as if Senoussi is already familiar to Barbouti and David. To that extent, the gist of the article is that Barbouti may be connected with *Senoussi*. The article does not, however, by its bare observation that Senoussi is Gadhafi's brother-in-law, assert that Barbouti is, in turn, connected with Gadhafi.

**February 21 article—conclusion.**

Appellants have not shown that the appellees failed to meet the burden in the trial court of showing that the February 21, 1992 article was substantially true.

Points of error one through six are overruled.

**Denouement.**

To deprive any party of a trial by jury is not something to be done without caution; however, the first amendment right to freedom of speech is of such necessity to a free society that the court's responsibility is to protect it jealously. Under these facts, construed most favorably in behalf of the appellant, that duty demands that we affirm the summary judgment.

The discussion of the remaining points of error does not meet the criteria for publication, TEX.R.APP.P. 90, and is thus ordered not published.

We affirm the judgment.

HUTSON–DUNN, J., requested a vote to determine if the case should be heard en banc, pursuant to TEX.R.APP.P. 79(d), (e) and TEX.R.APP.P. 90(e).

SCHNEIDER, C.J., and COHEN, HUTSON–DUNN, MIRABAL, WILSON, HEDGES, and TAFT, JJ., voted to rehear the case en banc.

O'CONNOR and ANDELL, JJ., voted against rehearing en banc.

SCHNEIDER, C.J., and COHEN, MIRABAL, WILSON, HEDGES, and TAFT, JJ., join Justice HUTSON–DUNN'S opinion.

O'CONNOR, J., dissents.

O'CONNOR, Justice, dissenting.

I dissent from the majority's resolution of points of error four, five, and six, regarding the February 21 article, and point of error 45, regarding Urban's affidavit.

The plaintiffs contend the Chronicle did not establish that the February 21 article was substantially true because (1) the Chronicle did not prove the Defense Intelligence Agency (DIA) was investigating Haidar Barbouti, (2) the Chronicle did not prove the DIA was reviewing the letter to Barbouti purportedly from Raja Hassan Ali, and (3) Urban's affidavit contained untrue statements, unsubstantiated opinion, and was not made on personal knowledge.

The February 21, 1992 article carried the headline, "Letter triggers new probe of Barbouti." As part of the article, the newspaper included a picture of Moammar Gadhafi. The article in its entirety appears in the majority opinion, slip op. pp. 40–41.

Barbouti's affidavit states that

This letter [to which the February 21, 1992 article refers] does not exist. I never received any such letter, I do not know nor have I ever met its purported sponsor or author Raja Hassan Ali, I do not know nor have I ever met Abdullah al-Senoussi. Defendant Urban refused in deposition to disclose the source of the letter (Urban dep. p. 247) or what efforts he made to authenticate it or determine whether it was a forgery or fabrication (Urban dep. p. 248), in each case relying on and refusing to disclose a "confidential source."

In Urban's affidavit attached to the Chronicle's motion for summary judgment, Urban supported the first two paragraphs of the article with the following statement:

I have long been aware of numerous federal investigations into alleged criminal activities of Haidar Barbouti, his father, Dr. Ishan Barbouti, and companies owned or controlled by Haidar and Ishan Barbouti, including not only the Department of Defense investigation referred to in the February 21, 1992 article, but also criminal investigations by the United States Custom Service. . . .

The majority opinion overrules point of error 45 in footnote nine, on the ground that Barbouti did not apply the authority he cited to the argument. The majority concedes Barbouti cited authority, but faults him for not applying it. Barbouti's brief "applies" the law as well as most briefs filed in this Court. See pages 57 and 58 of Barbouti's brief.

The Chronicle could have based its motion for summary judgment on the uncontroverted affidavit of an interested witness (Urban), but only if the affidavit was clear, positive, direct, or otherwise credible, free from contractions and inconsistencies, and could have been effectively countered by opposing evidence. *Casso v. Brand,* 776 S.W.2d 551, 558

(Tex.1989); *Republic Nat'l Leasing Corp. v. Schindler*, 717 S.W.2d 606, 607 (Tex.1986). In an affidavit supporting a motion for summary judgment, the affiant must show how he became personally familiar with the facts to be able to testify as a witness. *Radio Station KSCS v. Jennings*, 750 S.W.2d 760, 762 (Tex.1988); *Clark v. Pruett*, 820 S.W.2d 903, 906 (Tex.App.—Houston [1st Dist.] 1991, no writ). By Urban's statement "I have long been aware ..." Urban does not show how he is competent to testify about the existence of the DIA investigation. *See Carr v. Hertz Corp.*, 737 S.W.2d 12, 13 (Tex.App.—Corpus Christi 1987, no writ) (attorney's affidavit which stated he was "aware" of facts stated in response to motion for summary judgment was insufficient to show how he was competent to testify regarding issues of negligence).

The majority finds that Urban's reference to the eight exhibits supports his statement. None of the exhibits deals with a DIA investigation. Even if other federal agencies were investigating Barbouti (which the exhibits do not show), the DIA would not confirm or deny that it was investigating Barbouti. In his affidavit, Urban provided no information to support the article's statement that the DIA was investigating Barbouti. When Urban could not support the statement with any evidence, the Chronicle should have refrained from publishing it. Therefore, Urban's statement does not prove the substantial truth that the DIA was investigating Barbouti's connections with a suspected terrorist. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516, 111 S.Ct. 2419, 2432–33, 115 L.Ed.2d 447 (1991); *McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex.1990).[1]

The majority also finds that the tag "congressional sources say" somehow absolves the Chronicle because it admittedly published only rumor, not fact. Nothing in Urban's affidavit supports his "congressional sources" statement. Even if Urban was to repeat that in his affidavit, the attribution of a defamatory statement to unnamed persons does not

absolve the Chronicle of liability for publishing the statement.

The second issue on which I disagree with the majority's result concerns the statement that the DIA was reviewing a letter to Barbouti purportedly from Raja Hassan Ali. As stated earlier, the Urban affidavit does not support the statement that Barbouti was being investigated by the DIA. By making the statement in the article that Barbouti was being investigated by the DIA *about the letter from Raja Hassan Ali,* the Chronicle provided specific information about the investigation that seemed to support its initial statement that Barbouti was being investigated by the DIA. (The majority does not address this issue.) Not only did the Chronicle not prove that Barbouti was being investigated by the DIA, it did not show that the DIA (or any federal agency) was investigating Barbouti about the letter. The only information Urban could provide about the letter was that he saw that it was filed in a civil suit, which does not prove the substantial truth of the statement that Barbouti was being investigated by the DIA.

The third issue on which I disagree with the majority concerns the letter purportedly written to Haidar Barbouti, which mentions Abdullah al-Senoussi, a brother-in-law of Libya's Moammar Gadhafi. The majority holds that Barbouti's denial of the existence of the letter did not raise a fact issue concerning the physical existence of the letter. I disagree. By his affidavit, Barbouti raised a fact issue about it. Once Barbouti raised a fact issue, the burden was on the defendants to show the letter was what it purported to be; they did not.

The majority says the letter supports itself. A letter, like any document, requires a sponsor to verify that it is what it purports to be. TEX.R.CIV.EVID. 901(a) ("authentication ... is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims"); *In re G.F.O.*, 874 S.W.2d 729, 731 (Tex.App.—Houston [1st Dist.] 1994, no writ). The plaintiffs objected

---

1. The majority admits the articles were "not 100 percent accurate in every detail," but finds they were substantially true. In *Masson,* 501 U.S. at 516, 111 S.Ct. at 2432–33, the United States

Supreme Court said the law of libel "overlooks minor inaccuracies." Here, the majority overlooks major inaccuracies to find the article was substantially true.

to the letter because they believed it was a forgery or a fraud. They attempted to conduct discovery and find out where Urban got it, but were thwarted by the Chronicle's assertion of "confidentiality." The Chronicle should not be permitted to thwart discovery based on a privilege of "confidentiality" and move for summary judgment on the very same issue. *See, e.g., Dolcefino v. Ray*, 902 S.W.2d 163, 164 (Tex.App.—Houston [1st Dist.] 1995, orig. proceeding) (Texas does not recognize a privilege of confidentiality for journalists).

The letter, without any sponsor, is merely a piece of paper. Without a sponsor, the letter is no evidence that a person by the name of Raja Hassan Ali wrote a letter to Barbouti. Neither is the letter evidence that a third entity, the DIA, was investigating Barbouti based on the letter. I would sustain the points of error as they relate to the letter as evidence. Once the letter is subtracted as a source of summary judgment support for the February 21 article, the article lacks any summary judgment proof to show it was substantially true.

In summary, Urban's affidavit does not prove the substantial truth of the gist of the February 21 article—that because of the letter from Ali, the DIA was investigating Haidar's connections with a terrorist, who was a brother-in-law of Moammar Gadhafi. *See McIlvain*, 794 S.W.2d at 16.

I would hold the defendants did not prove underlying facts establishing the substantial truth of the February 21 article. I would sustain points of error four, five, six, and 45.

**TEXAS FARMERS INSURANCE COMPANY, Relator,**