Haidar **BARBOUTI, IBI Industries, Inc., First Houston Transamerican Corp., Highland Village Holding, Inc., and Windsor Plaza Holding, Inc., Appellants,**

v.

Bruce A. **MUNDEN and Pipeline Recovery Systems, Inc., Appellees and Cross–Appellants,**

v.

The **BARCHILDE TRUST and Heirs of the Estate of Dr. Ihsan Barbouti, Cross–Appellees.**

No. C14–92–01116–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 21, 1993.

Rehearing Denied Dec. 16, 1993.

W. James Kronzer, David M. Gunn, Houston, William V. Dorsaneo, III, Dallas, Luther H. Soules, III, San Antonio, Thomas R. McDade, James Patrick Smith, Houston, for appellants.

Brian E. Bro, Stephen D. Ingram, Houston, John Michael Johnston, Norman, OK, Keith C. Licesay, McAllen, for appellees.

Before ROBERTSON, CANNON and ROBERT E. MORSE, Jr. (Sitting by designation), JJ.

## OPINION

CANNON, Justice.

This appeal concerns a suit for breach of contract, fraud, and conspiracy brought by Bruce Munden and his company, Pipeline Recovery Systems, Inc., ("Munden"), appellees/cross-appellants. The central figure originally claimed to have been primarily responsible for the alleged wrongs, Dr. Ihsan Barbouti, died shortly after suit was filed. Appellants are the decedent's oldest surviving son, Haidar Barbouti ("Haidar"), who was sued individually, and four companies sued as conspirators, IBI Industries, Inc. ("IBI"), First Houston Transamerican Corp. ("First Houston"), Highland Village Holding, Inc. ("Highland") and Windsor Plaza Holding, Inc. ("Windsor").[1] After a jury trial, judgment was entered against appellants for $10.6 million for fraud and conspiracy to defraud.

Appellants now appeal, arguing that Munden's cause of action is in reality a breach of contract action and is barred by the statute of frauds. Appellants also contend that the evidence is insufficient to support the fraud and conspiracy findings and the damages awarded. In additional points of error, ap-

---

1. The suit also named the Barchilde Trust (a Barbouti family trust) and, after Dr. Barbouti's death, added his estate. The trust and Dr. Barbouti's estate and heirs, Anwar Barbouti, Jafar Barbouti, Aysar Barbouti, and Suham Barbouti, were deleted from the judgment and are now cross-appellees.

pellants argue that the trial court erred in admitting deposition testimony from other proceedings, admitting testimony in violation of the dead man's statute, and in permitting prejudicial jury argument.

Appellees raise two cross points, complaining that the trial court erred in granting judgment non obstante veredicto. Munden has perfected a separate cross appeal, in which he contends that the trial court erred in deleting the Barchilde Trust and the Heirs of the Estate of Dr. Barbouti from the judgment.

We reverse and render judgment that Munden take nothing on the fraud and conspiracy claims. The trial court's grant of JNOV is affirmed.

## FACTUAL BACKGROUND

Bruce Munden had been employed by Standard Pipeline Coating, Inc. ("Standard") in Dallas, Texas. Standard was in the process of developing a technology for rehabilitating pipe lines. On December 13, 1974, all the officers and directors of Standard were killed in a plane crash. After leaving Standard's employ, Munden eventually formed a Texas company called Pipeline Recovery Systems, Inc. in March 1988. This company, as well as two of Munden's prior companies that had failed, intended to further develop and use the technology for pipe coating that Munden had learned while employed by Standard. Munden's process involved the use of epoxies to coat the pipe while it is "in situ," or in place.

Munden needed to obtain financing for his new operations. In the spring of 1988, Munden met with a representative of Dr. Ihsan Barbouti, who was a wealthy Arab investor living in London. Munden made representations that he either had obtained, or was in the process of obtaining, a patent on the pipe coating process. After several meetings in London and Texas, Munden contends that he and Dr. Barbouti agreed to form two companies, one in the U.S. and the other a foreign company. These companies would complete projects using Munden's technology for in situ pipe coating, with Dr. Barbouti and his company, IBI, providing the funding. The U.S. company was to be owned equally by Munden and Dr. Barbouti, and the foreign company was to be owned 80% by Dr. Barbouti and 20% by Munden. This agreement was reached on or about August 20, 1988, and its terms were purportedly set out in a letter to Dr. Barbouti from Munden dated August 11, 1988, and agreed to by Dr. Barbouti on December 8, 1988. Munden was to receive the 20% ownership in the foreign company "in return for the license of technology and [his] assistance."

Munden began domestic operations under the name of U.S. Pipe Technology, Inc. ("U.S. Pipe"), a company he incorporated in 1988. Munden executed a one-year license agreement to use his process to U.S. Pipe. During 1988 and 1989, Dr. Barbouti provided more than $500,000 in funding for equipment and operations and Munden completed twenty domestic projects. The license agreement expired in December 1989, and was not renewed.

In early 1989, Munden began training two British technicians, John Oughten and Ray Dorward, to use the pipe coating process so they could employ it in the foreign operations. The relationship between Munden and Dr. Barbouti deteriorated when Munden became suspicious that Dr. Barbouti's people were trying to steal his technology and cut him out of the foreign operations. He contends that Dr. Barbouti intended to use the process in Iraq and Libya, possibly involving nuclear reactors and chemical weapons plants.

Munden surrendered his rights to any foreign patent on his process on August 16, 1989. At time of trial, no U.S. or foreign patent had been issued on Munden's process. Munden had applied for a U.S. patent and been rejected, but a continuation, or re-application, was pending at the time of trial.

Munden and IBI entered another agreement dated August 14, 1989, which provided that IBI would supply up to $200,000 additional funding for domestic projects, but if any funds beyond that sum were advanced, IBI's ownership percentage would increase. Munden referred to this agreement at trial as the "joint venture agreement." The parties disagree over the extent of the additional

funding provided; however, the record shows that Munden was having problems paying suppliers and meeting his payroll during late 1989. Munden shut down the U.S. operations of Pipeline Recovery and U.S. Pipe in December, 1989. There is no evidence in the record that International Pipe Technology, or Pipe Technology International, the foreign company, was ever incorporated or that Munden received any shares in the company. The foreign company did not engage in commercial activity; there is only a vague reference in the record to one possible use of the process in Abu Dhabi.

Munden contends that Dr. Barbouti promised to trade Munden a 20% interest in property holding companies to be formed in Texas in exchange for Munden's 20% interest in the foreign operations. His claim is that these property holding companies are appellants Highland and Windsor. Highland and Windsor were incorporated in January 1990, and are wholly owned subsidiaries of Trans American Holding Corporation. After Windsor and Highland were formed, they each acquired a shopping center. Haidar was involved in the negotiations for the purchase of Highland Village Shopping Center and an earnest money contract was executed by Trans American Holding Corporation and transferred to Highland. Highland Village Shopping Center was acquired for a purchase price of $33,683,000, which included a $22 million loan, on April 25, 1990. Windsor Plaza Shopping Center was purchased for $18 million on July 31, 1990, and Haidar guaranteed the $8 million purchase loan. The purchase funds for both properties were provided by the Barchilde Trust, which owns Trans American Holding Corporation. Haidar and his siblings are the beneficiaries of the Barchilde Trust. Munden did not receive any interest in Windsor or Highland or any other domestic holding companies. He filed the suit that is the subject of this appeal in February 1990. Dr. Barbouti died in July 1990.

## THE TRIAL

Munden sought to recover damages based upon his claimed 20% interest in the two corporations, Highland and Windsor. The agreement for the exchange of the 20% interest in foreign operations for 20% of the Texas property holding companies is reflected in two of Munden's exhibits at trial, PX–3 and PX–4. Each of these exhibits is a copy of a faxed letter from Dr. Barbouti to Munden, bearing the date of September 15, 1989. PX–3 states as follows:

> This is to confirm your agreement to accept twenty percent of a Texas company or companies to be formed prior to the first of the year, called First (Houston) Transamerican Corp. and its property holding company, instead of twenty percent of the foreign operating company mentioned in our prior contract.

PX–4 is the same, except instead of an interest in First (Houston) Transamerican Corp., it refers to a "New York company or companies to be formed prior to the first of the year, called First Trans American Corporation and its property holding companies." Munden testified he received PX–4 by fax on November 17, 1989. He claims Haidar showed him PX–3 in Haidar's Houston office, and Munden later made a copy of it. The date this occurred is not specified in the record.

Appellants supplied expert testimony at trial that one or both of these letters was a forgery, made by copying or superimposing Dr. Barbouti's signature from one to the other, or from a third document. Originally, Munden brought a breach of contract claim against Dr. Barbouti based upon these writings. Munden now contends Dr. Barbouti committed fraud, and the other defendants were part of a conspiracy to commit the fraud.

Munden went to trial on his Eleventh Amended Petition. Appellants' amended answer raised several affirmative defenses, including the statute of frauds. At trial, the jury found:

> (1) that Dr. Barbouti and IBI failed to comply with written and oral agreements to fund Munden's domestic operations in a joint venture to be called International Pipe Technology, and awarded $2 million in damages on that claim.
>
> (2) that there was no written agreement to exchange 20% interest in a property hold-

ing company or companies for Munden's 20% interest in foreign pipecoating operations;

(3) that Dr. Barbouti committed fraud by false representation that he would make the above described exchange, and awarded damages of $10.6 million, based on 20% of the value of the holding companies;

(4) that appellants conspired to obtain Munden's 20% interest in foreign operations by fraud or theft and awarded damages of $10.6 million, based on 20% of the value of the foreign operations;

(5) attorney's fees in the amount of $168,250 should be awarded based upon the written agreement to fund domestic operations; and

(6) that the corporate defendants and the Trust were used for the purpose of perpetrating a fraud for the personal benefit of Dr. Barbouti or Haidar Barbouti (i.e., the corporations were the alter egos of the Barboutis).

After the jury verdict, Munden waived his claim for punitive damages, which was to have been considered in a bifurcated proceeding. The trial court granted JNOV on the finding of a breach of the agreement to fund, finding no evidence of a joint venture agreement and insufficient evidence of damages, deleting the award of the $2 million in damages and the attorney's fees. The court also granted JNOV on the alter ego finding, rejecting Munden's theory on "reverse piercing" of the corporate veil. The court's grant of JNOV forms the basis for Munden's two cross points in the main appeal. The court entered its final judgment on April 14, 1992, leaving an award of $10.6 million based on fraud and conspiracy to defraud. On June 23, 1992, in response to Defendants' Motion for New Trial and to Modify Judgment, the court amended its judgment to delete the awards against the Trust and the Heirs of Dr. Barbouti's estate on procedural grounds, accepting the argument that trusts and estates are not legal entities subject to suit. Appellants also argued that the trustee was not served with process and did not participate at trial, and heirs are liable only if inherited funds are traced to the deceased, which Munden failed to do. Objection to this modification of the final judgment deleting the Trust and the heirs forms the basis of Munden's cross-appeal.

## DISCUSSION

### Breach of Contract or Fraud?

On appeal, appellants Haidar Barbouti, IBI Industries, Inc., and First Houston Trans American Corp., bring thirteen points of error. These appellants contend in their first point of error that this case is a breach of contract action and Munden's claims are barred by the statute of frauds. They argue that Munden cannot avoid the writing requirement of the statute of frauds by changing his cause of action from breach of contract to fraud. Appellants Highland and Windsor bring six points of error, complaining that the evidence is insufficient to link them to the alleged conspiracy and alleging many of the same complaints raised by the other appellants. Their third point of error mirrors the other appellants' contention that the statute of frauds bars this action.

■ The central issue in this appeal is the claim by Munden that Dr. Barbouti promised to exchange a 20% interest in a property holding company or companies for Munden's 20% interest in foreign pipe coating operations. While Munden has alleged breach of contract, fraud and conspiracy to commit fraud, all based upon the same facts, we believe that breach of contract is the proper action. Appellants' liability, if any, arises from failure to comply with the exchange agreement; therefore the claim sounds only in contract. *See Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex.1991).

■ Where the essence of the action is in substance one for breach of contract, the action sounds in contract. *Int'l Printing Pressmen & Assistants' Union v. Smith*, 145 Tex. 399, 409, 198 S.W.2d 729, 735 (1946). In our opinion, Munden's objective is to enforce the promised exchange; therefore, his claim is actually for breach of contract. We follow the position this court previously advanced in rejecting an attempt to allege fraud to circumvent an unenforceable oral contract:

Where plaintiff, although casting his complaint in the form of a cause of action for fraud, is attempting to recover damages for the breach of a promise, it is clear that he is in effect, attempting to enforce the oral agreement. Where, as here, plaintiff is seeking to recover what he would have gained had the promise been performed, i[t] is evident that the gist of his cause of action is the breach of the unenforceable promise.... Since plaintiff is here seeking to recover what he would have gained had the promise been performed, it is apparent that his action, while cast in language sounding in tort, is an indirect attempt to recover for the breach of the unenforceable promise and is, therefore, barred by the statute of frauds.

*Webber v. M.W. Kellogg Co.*, 720 S.W.2d 124, 129 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (quoting *Collins v. McCombs*, 511 S.W.2d 745, 747 (Tex.Civ. App.—San Antonio 1974, writ ref'd n.r.e.)).

Munden also confessed that he had repleaded his case to change the contract claim to one for fraud. He admitted that he originally sued for breach of contract and amended his suit to claim fraud, contending the "the things that Dr. Barbouti had promised [him] under the heading of breach of contract in the original petition became representations in connection with [his] ... fraud claim in the amended pleadings."

 The nature of plaintiff's loss should be examined to determine if he may recover on a tort theory. *DeLanney*, 809 S.W.2d at 494. Here, Munden sought contract damages, not tort damages. His petition prayed for: "Actual damages of $12,000,000.00 resulting from the failure to convey a twenty percent (20%) interest" in the shopping centers or holding companies. Where a plaintiff is seeking to recover what he would have gained had the promise been performed, the action is one for breach of contract. *Webber*, 720 S.W.2d at 129. We hold that Munden's cause of action is for breach of contract.

### Statute of Frauds

 Having found that Munden's action sounds in contract, we now consider the statute of frauds. The statute of frauds requires that certain specified classes of contracts be in writing to be enforceable. Whether a contract falls within the statute of frauds is a question of law. *Bratcher v. Dozier*, 162 Tex. 319, 346 S.W.2d 795, 796 (Tex.1961). At trial, Munden admitted that the exchange of the foreign interest for the interest in the domestic holding companies was a swap of "stock for stock." Thus, the contract was for a sale of securities. Because we find there was an agreement for the sale of securities, a specific provision of the statute of frauds applies. TEX.BUS. & COM.CODE ANN. § 8.319 (Vernon 1991). Specifically, section 8.319 provides in relevant part:

A contract for the sale of securities is not enforceable by way of action or defense unless:

(1) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker, sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price....

TEX.BUS. & COM.CODE ANN. § 8.319(1) (Vernon 1991).

Realizing that he may have been barred by the statute of frauds, Munden apparently attempted to shift his cause of action to one for fraud. In addition to his admission that he changed his pleadings to fraud based upon the same facts as his contract action, Munden demonstrated his inconsistency throughout these proceedings. Early on, he insisted that he had a writing. At one point during trial, Munden admitted that he did not have a written agreement, but only a "written memorialization of' [their] oral agreement." In attempting to avoid summary judgment based on the statute of frauds, he argued, "We have a writing." He contended that such a writing was "enforceable under § 8.319(1)." He told the judge he had "a signed writing transferring the securities and we should be. able to go to the jury on that claim." He asked the court to submit PX–3 and PX–4 to the jury to determine if the writing was sufficient. The sufficiency of Munden's writing was submitted in jury question three, and the jury found that there

was no written agreement. This finding is not challenged on appeal. Even had the jury not so found, these writings are inadequate. They do not give the price and they do not specifically mention Highland or Windsor. There is no written connection to them and no way to establish the price of the securities, as required by section 8.319(1).

■ On appeal, Munden has abandoned the argument that he has a writing and now contends that the statute does not apply or that he has satisfied it. If a party claims that an exception to the statute of frauds exists, he must secure a finding to that effect. *W.H. McCrory & Co. v. Contractors Equip. and Supply Co.*, 691 S.W.2d 717, 720–21 (Tex.App.—Austin 1985, writ ref'd n.r.e.). Munden failed to secure such a finding. Furthermore, we disagree with his contention that he has somehow satisfied the statute by making "payment." Munden claims he made payment by training the British technicians and some other actions undertaken in performance of the original agreement with Dr. Barbouti. He relies on section 8.319(2), which allows a contract for the sale of securities to be enforced when share delivery has been accepted, share registration has been made, or "payment has been made." TEX.BUS. & COM.CODE ANN. § 8.319(2) (Vernon 1991). The contract is then enforceable to the extent of the payment or delivery made. *Id.* We believe that this section means what it says: "payment" is required, as in the payment of money, not merely other forms of conduct, as Munden alleges. *See Smith v. Crockett*, 485 S.W.2d 317, 320–21 (Tex.Civ. App.—Tyler 1972, writ ref'd n.r.e.).

Munden also claims that some sort of fiduciary relationship existed, and consequently the statute does not apply. He apparently abandons the allegation that appellants "stole" his trade secrets and now claims that he voluntarily disclosed them as part of a confidential relationship. We reject this contention for two reasons. First, Munden did not present this argument in the court below. Munden failed to plead a cause of action for breach of fiduciary duty, his proof does not support the existence of a fiduciary relationship, and there again is no jury finding that this "exception" to the statute existed. Even

if Munden had not waived this contention, we reject his argument that an exception to section 8.319 based upon a fiduciary relationship exists under the facts presented here. An otherwise unenforceable oral agreement may only be enforced in equity when nonenforcement would itself amount to a fraud. *Hooks v. Bridgewater*, 111 Tex. 122, 128, 229 S.W. 1114, 1116 (1921). Here, because of the hotly disputed facts of this case and the likelihood that certain key documents were forged, the policy behind the statute of frauds demands its enforcement. Therefore, we hold that Munden's action is barred by the statute of frauds. We sustain the first point of error raised by Haidar, IBI and First Houston, and we sustain the third point of error brought by appellants Highland and Windsor.

### No Evidence to Support the Fraud Claim

■ Even though we believe that Munden's cause of action is properly one for breach of contract, if a fraud action were appropriate in this case, it would also fail for several reasons. First, in our opinion, application of the statute of frauds to a contract vitiates a fraud claim based on the same facts. *See Webber v. M.W. Kellogg Co.*, 720 S.W.2d at 129, and cases cited therein. Moreover, Munden's claim of fraud fails because it is not supported by the evidence. There is no evidence to support the jury's finding of fraud. In determining a legal sufficiency of the evidence question, we must consider only the evidence and inferences that tend to support the finding, and disregard all evidence and inferences to the contrary. *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex.1990). If there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983).

■ For a promise of future performance to be the basis of actionable fraud, it must have been false at the time it was made. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 597 (Tex.1992); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 433 (Tex.1986). Failure to perform, standing alone, is no evidence of the

promisor's intent not to perform, but is a circumstance to be considered with other facts to establish intent. *Schindler v. Austwell Farmers Co-op.*, 841 S.W.2d 853, 854 (Tex.1992). Denial that a promise was made alone does not constitute evidence that the defendant never intended to perform his promise. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex.1992).

Munden failed to present evidence that, at the time the promise or representation was made, Dr. Barbouti did not intend to perform it. The proof cited in Munden's brief to support his contention that there was never any intent to perform is, in its entirety, as follows:

> Haidar gave Munden verbal assurances and a written representation purportedly from Dr. Barbouti (PX–3) that Munden would be given an ownership interest in First Houston and its property holding companies;
>
> Haidar later denied ever giving those representations;
>
> Munden received nothing;
>
> Haidar had denied that First Houston existed and that he was its only officer and director;
>
> Haidar testified First Houston's formation was a "mistake;"
>
> Haidar testified First Houston was never meant to own any property.

We conclude, after disregarding all evidence to the contrary, that this purported evidence of Dr. Barbouti's intention not to perform is so weak that it creates only a mere surmise or suspicion of its existence. Thus, the evidence is so weak that it amounts to no evidence and will not support a verdict. *See Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 755 (Tex.1970).

### Damages

▇▇▇ Munden's fraud claim also cannot succeed because he failed to prove his damages. As discussed above, Munden sought

contract damages; he sought the benefit of his bargain. Question five, premised on the jury's finding of fraud, asked:

> What sum of money, if paid now in cash, would fairly and reasonably compensate Bruce Munden for such 20% interest in a property holding company or companies, valued as of the date of acquisition of the properties?

This question submitted benefit-of-the-bargain as the measures of damages. The jury found that these damages were $10.6 million. Appellants contend that out-of-pocket is the correct measure of damages for fraud.[2] It is not necessary to determine which measure should have been used because Munden proved neither.

▇▇▇ In addition, out-of-pocket damages were submitted on the conspiracy to defraud claim in question seven. The jury found that these damages were also $10.6 million based on the value of the 20% of the foreign operations. Even if we consider only evidence and inferences to support this finding, we must conclude that there is legally insufficient evidence of what 20% of the foreign interest is worth. The *only* evidence submitted at trial to support his damages for the foreign interest is PX–115, a handwritten piece of paper purportedly written by Dr. Barbouti referring to three proposed contracts, and described by the trial court as a "bunch of numbers." In making a valuation finding, jurors are not authorized "to leap entirely outside the evidence in answering any question submitted to them." *Callejo v. Brazos Elec. Power Co–Op., Inc.*, 755 S.W.2d 73, 75 (Tex.1988). Damages must be based on competent evidence, not mere conjecture. *Moore v. Canadian Commercial Bank*, 672 S.W.2d 324, 326 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

▇▇▇ Munden was required to bring forward evidence of the value of the foreign company. The preferred method to prove damages based upon an interest in a company is to prove the value of corporate stock.

---

**2.** Out-of-pocket damages are measured as the difference between the value of that which was parted with and the value of that which was received. *George v. Hesse*, 100 Tex. 44, 93 S.W. 107 (1906). Benefit-of-the-bargain damages are measured by the difference between the value as represented and the value actually received. *Johnson v. Willis*, 596 S.W.2d 256, 262 (Tex.Civ. App.—Waco), *writ ref'd n.r.e. per curiam*, 603 S.W.2d 828 (Tex.1980).

*See InterFirst Bank Dallas, N.A. v. Risser,* 739 S.W.2d 882, 891–92 (Tex.App.—Texarkana 1987, no writ). An alternative method is to determine the difference between the value of the assets and amount of liabilities of the company. *Southwestern Bell Tel. Co. v. Wilson,* 768 S.W.2d 755, 762 (Tex.App.—Corpus Christi 1988, writ denied). Munden provided no evidence of the value of the stock of the foreign company or of any assets or liabilities. Instead, he tried to prove lost profits. Lost profits are not the same as the value of the "interest" in the foreign operations. Even if we accepted his contention that lost profits somehow establish the value, his proof fails. Munden testified that PX–115 represents calculations made by Dr. Barbouti of projected earnings on three proposed foreign contracts.[3] These projects were not identified by location, beginning date, or any other method. The exhibit does not even indicate it refers to the use of the pipe coating process. The figures on the exhibit total $72 million. Munden concludes that 20% of $72 million is over $14 million, or more than the $10.6 million awarded by the jury, so his evidence was more than sufficient to support the damage award. Munden also argues that because Dr. Barbouti made these projections, his successors are estopped to deny them now. Finding no support in Texas law for this estoppel theory, we reject it.

▆▆▆ Recovery for lost profits does not require exact calculation, but the amount of the loss must be shown by competent evidence with reasonable certainty. *Holt Atherton Industries, Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992). At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *Id.* Recovery of lost profits must be predicated on one complete calculation. *Id.* at 85.

Here, Munden's evidence is legally insufficient because it does not provide any readily understandable explanation of how Dr. Barbouti determined what the estimated profits would be. One party's testimony of estimated profits, without proof of the existence of an actual contract or any objective data, is not sufficient in our opinion to support an award of lost profits. *See Lovelace v. Sabine Consolidated, Inc.,* 733 S.W.2d 648, 655–56 (Tex.App.—Houston [14th Dist.] 1987, writ denied). Thus, there is no basis for an award of out-of-pocket damages, and the fraud action fails if that measure were used. Because the conspiracy to defraud finding based damages on the out-of-pocket measure, Munden's conspiracy cause of action must also fail.

Munden's proof of benefit of the bargain damages also fails. Munden attempted to establish the market value of the two shopping centers, *not* the value of the holding companies that own them. Munden's only proof in this regard is the purchase price paid for the two shopping centers. He brought no evidence of the value of the stock of the holding companies. He offered no proof of the value of *all* the assets and liabilities of the companies. This evidence is insufficient to establish the value of 20% of the holding companies.

In conclusion, even had we not found that Munden's claim is for breach of contract, his causes of action for fraud and conspiracy to defraud could not succeed because he failed to prove his damages. Moreover, he failed to prove damages for breach of contract, had his contract claim not been barred by the statute of frauds.

## CROSS POINTS

▆▆▆ Because we sustain the points of error barring Munden's cause of action, we need not address appellants' other points of error. However, we still must address Munden's complaint in his first cross point that the trial court erred in granting JNOV to delete its $2 million damage award for failure to fund the domestic operations, and the accompanying attorney's fees. The trial court disregarded the jury's answers to questions one and two. The jury found in question one that Dr. Barbouti breached his oral promise to fund Munden's domestic operations in a joint venture called International

---

3. Because we find the evidence insufficient, we need not reach the issue that Munden's explanation of what Dr. Barbouti told him about this exhibit was not corroborated, violating the dead man's statute. *See* Tex.R.Civ.Evid. 601(b).

**298**

Pipe Technology, and that Dr. Barbouti's company, IBI Industries, breached a written agreement for this funding dated August 14, 1989. In answer to question two, the jury found that damages for this breach were $2 million.

Appellants contend that Munden has waived this complaint because he did not properly complain in his brief about the trial court's finding against liability. We agree. Complaints on appeal must be stated in points of error. Tex.R.App.P. 74(d). A court of appeals may not consider error when it is not assigned by a point of error. *Vawter v. Garvey*, 786 S.W.2d 263, 264 (Tex.1990); *San Jacinto River Auth. v. Duke*, 783 S.W.2d 209, 210 (Tex.1990). Munden failed to bring a point of error on the finding against liability. He failed to argue that there was in fact sufficient evidence of a joint venture or that IBI breached its written agreement. His only argument in his brief is about the sufficiency of the evidence of damages. He gains nothing by attacking the court's conclusion that there is no evidence of damages without first attacking the court's finding of no joint venture. The court's finding of no liability stands unchallenged, and we may not decide this issue in this appeal. *See Midway Nat'l Bank v. West Texas Wholesale Supply Co.*, 453 S.W.2d 460, 460–61 (Tex.1970). The aggrieved party must assign error to each ground supporting the judgment or risk having the judgment affirmed. *Texas Dept. of Human Resources v. Orr*, 730 S.W.2d 435, 436 (Tex.App.—Austin 1987, no writ). We overrule Munden's first cross point and affirm the trial court's grant of JNOV.

### CONCLUSION

Because we reverse and render judgment that Munden take nothing on the fraud and conspiracy to defraud claims, we need not address Munden's second cross point complaining that the trial court erred in granting JNOV on the alter ego finding. A finding of alter ego is now irrelevant. In addition, without a judgment against Haidar Barbouti and the corporations for fraud and conspiracy to defraud, we need not discuss the issues raised in Munden's cross appeal, which con-

cern the deletion from the judgment of the Barchilde Trust and Dr. Barbouti's heirs.

We reverse and render judgment that Munden take nothing and affirm the trial court's grant of JNOV.