In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00149-CR


______________________________




LARRY DON SESSUMS, SR., Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 6th Judicial District Court


Fannin County, Texas


Trial Court No. 19556




 




Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Justice Ross



O P I N I O N



 A jury convicted Larry Don Sessums, Sr., of one count of aggravated sexual assault
of a child and one count of indecency with a child. The convictions originated from a single
indictment containing multiple counts. The jury assessed punishment at forty years'
imprisonment for aggravated sexual assault of a child and twenty years' imprisonment for
indecency with a child. Our opinion only addresses Sessums' conviction of aggravated
sexual assault of a child. 

 Around July 1, 1999, Jennifer Wallace, J.D.S.'s mother, walked into a bedroom and
discovered her five-year-old son, J.D.S., performing oral sex on Charles Ray Woods, the
stepfather of her husband, Aaron Wallace. (1) This incident provoked an investigation by
Child Protective Services (CPS). As part of the investigation, Ron Hamilton, a CPS
investigator, interviewed J.D.S. During the interviews, J.D.S. revealed that, in addition to
the sexual abuse by Woods, his "pawpaw" had also sexually abused him. J.D.S.'s
"pawpaw" was identified as Sessums, his paternal grandfather.

 Sue Jennings, a licensed professional counselor and certified sex offender
treatment provider, also interviewed J.D.S. According to Jennings, J.D.S told her his
"pawpaw had done some bad things" like messing with his (J.D.S.'s) "private parts" by
using his (Sessums') "finger and his hand" and touching his (J.D.S.'s) "pee-pee" and
"bobo" with his (Sessums') "pee-pee." Jennings testified that when J.D.S. said "bobo" she
understood this to mean his "bottom."

 Based on these interviews, the State charged Sessums with one count of
aggravated sexual assault of a child and one count of indecency with a child. 

 At trial, no medical evidence or eyewitness testimony was adduced. The State's
evidence consisted of testimony of four expert witnesses and the testimony of J.D.S's
step-grandfather, Jim Hale.

 A jury convicted Sessums of one count of aggravated sexual assault of a child and
one count of indecency with a child. On appeal, Sessums raises five points of error. 
Because his second point of error is dispositive, we will not address points one, three, four,
or five.

 In his second point of error, Sessums contends the evidence at trial was both legally
and factually insufficient to prove beyond a reasonable doubt the elements of aggravated
sexual assault of a child. Specifically, Sessums challenges the sufficiency of the evidence
to support the penetration element of the offense.

 In reviewing the legal sufficiency of the evidence, we look at all of the evidence in
the light most favorable to the verdict to determine whether any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt. Sells v.
State, No. 73,993, 2003 Tex. Crim. App. LEXIS 63, at *4-5 (Mar. 12, 2003) (citing Jackson
v. Virginia, 443 U.S. 307 (1979)). Any inconsistencies in the evidence should be resolved
in favor of the verdict. Armstrong v. State, No. 03-02-00211-CR, 2003 Tex. App. LEXIS
4321, at *7 (Austin May 22, 2003, no pet. h.).

 The indictment against Sessums for aggravated sexual assault of a child alleged
Sessums intentionally or knowingly sexually assaulted J.D.S., a child younger than the age
of fourteen and not the spouse of the defendant, by causing the defendant's finger to
penetrate the anus of J.D.S. On the issue of penetration, the State offered no medical
evidence. The State, however, contends the evidence taken in its totality is legally
sufficient on the issue of penetration. First, the State directs us to Jennings' testimony. 
According to Jennings, J.D.S. told her his "pawpaw" had done "some bad things," including
touching J.D.S.'s "pee-pee" and "bobo" with his "pawpaw's" "pee-pee," and touching his
"private parts" with his "pawpaw's" hand and finger. Ronald Jeff Hamilton, a CPS
investigator, and Laura McAndrews, a therapist with Helping Hands Home for Children,
also testified that, during their interviews with J.D.S., he revealed that his "pawpaw" had
touched his "private parts." In addition to this expert testimony, the State points to the
testimony of Hale. On direct examination, the following exchange occurred between the
prosecutor and Hale: 

 [Prosecutor]: All right. Did you have occasion to talk to [J.D.S] alone? 


 [Hale]: Yes, sir.


 [Prosecutor]: In 1998?


 [Hale]: Yes, sir.


 [Prosecutor]: Do you remember him telling you something important
in 1998?


 [Hale]: Yes, sir.


 [Prosecutor]: What did he tell you?


 [Hale]: . . . I was hooking up to do my dialysis and I asked [J.D.S] to
sit down in peepaw's recliner and he hung his head like this and he said, "I
can't, peepaw," and I said why, and he said, "my bobo is sore." I said what,
[sic] "do you mean your bobo is sore." And he hung his head again and he
said, "pawpaw's been playing with it."


 [Prosecutor]: Who did you understand him to me [sic] by pawpaw?


 [Hale]: Larry Don Sessums, Sr.


 [Prosecutor]: When he told you that, what was your reaction?


 [Hale]: Very upset and beet red.


 [Prosecutor]: What do [sic] you understand him to mean when he told
you that?


 [Hale]: In my own mind, I drew a conclusion that he had been
messing with his bobo. 


 [Prosecutor]: As in spanking him or what?


 [Hale]: No.


 [Prosecutor]: Was it clearly something other than spanking?


 [Hale]: Yes.


 [Prosecutor]: What was it clear to you that it was?


 [Hale]: In my own words? In my own words, I think he was molesting
the child.


 The State insists that Hale's testimony about a "sore bobo" and a belief that J.D.S.
was molested combined with Jennings', Hamilton's, and McAndrews' testimony that
Sessums touched J.D.S.'s "private parts" was legally sufficient evidence on the issue of
penetration. We disagree.

 While there is evidence supporting the proposition that Sessums touched J.D.S.'s
"private parts" and "bobo," the State offered no evidence specifically defining these
nontechnical terms. Although Jennings testified that, when J.D.S. said "bobo," she
understood him to be referring to his "bottom," no evidence was adduced indicating he was
specifically referring to his anus. Without conjecture and speculation, we cannot know to
what J.D.S. was referring when he used the terms "bobo," "pee-pee," and "private parts."

 Moreover, Hale's testimony that J.D.S. had a "sore bobo" does not necessarily
equate to a reference to a sore anus, or that the soreness to which J.D.S. was referring
was caused by the penetration of Sessums' finger. In short, the State offered no evidence
linking the soreness to penetration. Again, the conclusion that the soreness in J.D.S.'s
"bobo" was caused by the penetration of Sessums' finger can only be arrived at with the
aid of conjecture and speculation. 

 Because there is no evidence supporting the allegation Sessums penetrated
J.D.S.'s anus with his finger, we conclude the evidence was legally insufficient on the
indicted offense of aggravated sexual assault of a child. We sustain Sessums' second
point of error as legally insufficient and render a judgment of acquittal on count
one-aggravated sexual assault of a child. See Clewis v. State, 922 S.W.2d 126, 133 (Tex.
Crim. App. 1996). Because Sessums' conviction of aggravated sexual assault of a child
is reversed for legally insufficient evidence, we do not need to address his other points of
error, including a review of the factual sufficiency of the evidence.

 Finally, although Sessums contended at oral argument he appealed both his
conviction for aggravated sexual assault and indecency with a child, in his brief, he made
no argument specifically identifying his conviction of indecency with a child. Rather, his
brief contains only references to his conviction of aggravated sexual assault of a child. 
Therefore, Sessums' brief is inadequate on his conviction of indecency with a child and
presents nothing for our review. See Tex. R. App. P. 38.1(h) (requiring brief contain clear
and concise argument for contentions made, with appropriate citations to authority and the
record); McDuff v. State, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997); see also Ladd v.
State, 3 S.W.3d 547, 575 (Tex. Crim. App. 1999) (holding that requiring appellants to abide
by briefing rules and make reasonable arguments does not offend due process). 


 We reverse Sessums' conviction of aggravated sexual assault of a child and render
a judgment of acquittal as to count one of the indictment. 



 Donald R. Ross

 Justice


Date Submitted: June 20, 2003

Date Decided: June 27, 2003


Do Not Publish


1. Woods was convicted of sexual assault of a child.


nd, when money was available, made partial payments of 
rent from that account. In March 2002, the Texas Comptroller froze the operating account
because of another delinquency, this time of over $23,000.00, in unpaid sales taxes. At
that point, it became clear Zinda had been taking money from that account for his own use. 
By April 2, Zinda accumulated enough funds to pay the levied amount.
          The Smiths evidently began to discuss with Zinda acquiring a fifty-one percent
interest in the partnership until payments for the building were complete. While negotiating
that matter, they discovered that Zinda again owed over $60,000.00 in unpaid payroll
taxes, that he had used that money himself, and that checks written on the alcoholic
beverage replacement account were bouncing because Zinda had been skimming from
that account. On April 10, the Smiths began the process of foreclosure. The evidence
shows that Zinda arrived while the locks were being changed and that Zinda and the
Smiths, at that point, discussed options that might keep the restaurant open. The Smiths
proposed Zinda turn over operation of the restaurant, but continue as a host with a salary
of $4,500.00 per month. The outstanding bills of suppliers were to be paid by the Smiths
up to a maximum of $27,000.00, but with the amount of those bills to be taken off the back
end of what was owed Zinda in salary. Zinda agreed to this arrangement and urged Fritz
Kirl, the restaurant's long-time assistant manager, and his wife, Barbie, a waitress, to stay
with the operation. There is evidence Zinda apologized to the Kirls for "it happening,"
which he attributed to his gambling and options trading. 
          Zinda remained as host of the restaurant for a few weeks, but when the Smiths
received the alcoholic beverage replacement statement, it showed that, on April 10, Zinda
had withdrawn another $2,500.00. According to the appellees, this was "the final straw."
          The case was tried to a jury. At the close of Zinda's case, the court directed a
verdict against Zinda's claims for defamation, intentional interference with contracts
between Zinda and his employees and suppliers, and that Zinda take nothing on his claim
for malice. At the close of all evidence, the jury found (on the counterclaims) that the
partnership was due $15,675.00 for past-due rentals and late charges under the lease, that
Kyle was due $18,000.00 on the sale of the "Bless Your Heart" property, and that the
Smiths were entitled to $29,377.78 for the balance of a $33,050.00 note. The trial court
granted judgment pursuant to the jury's verdict and ordered the Smiths' security interest
in Zinda's limited partnership interest be foreclosed. 
Directed Verdict and Denial of Judgment Notwithstanding the Verdict 
          Zinda raises a series of arguments based on his contention the court erred by
granting a directed verdict and by failing to grant a judgment notwithstanding the verdict
on his allegations of (1) wrongful eviction; (2) breach of the covenant of quiet enjoyment;
(3) breach of fiduciary duty; (4) conversion of the lease and his personal property; and
(5) tortious interference with contract. 
          1. Wrongful eviction/breach of the covenant of quiet enjoyment
          We first address Zinda's contentions concerning wrongful eviction and breach of the
covenant of quiet enjoyment.


 Zinda contends the court erred by failing to submit an issue
to the jury on wrongful eviction because there was some evidence he was wrongfully
evicted. His follow-up argument is that he proved, as a matter of law, he was wrongfully
evicted and that the court thus also erred by overruling his motions for instructed verdict
and judgment notwithstanding the verdict.


 
          Rule 277 requires a trial court to submit instructions and definitions to the jury as are
necessary to enable the jury to render a verdict. See Tex. R. Civ. P. 277; Elbaor v. Smith,
845 S.W.2d 240, 243 (Tex. 1992). The complaining party must establish that the error
amounts to such a denial of rights as was reasonably calculated to cause and probably did
cause the rendition of an improper judgment. Tex. R. App. P. 44.1; Island Recreational
Dev. Corp. v. Republic of Tex. Sav. Ass'n, 710 S.W.2d 551, 555 (Tex. 1986); Autry v.
Dearman, 933 S.W.2d 182, 188 (Tex. App.—Houston [14th Dist.] 1996, writ denied). A
judgment must be reversed when a party is denied proper submission of a valid theory of
recovery or a vital defensive issue raised by the pleadings and evidence, if timely raised
and properly requested as part of the charge. Exxon Corp. v. Perez, 842 S.W.2d 629, 631
(Tex. 1992); Mayes v. Stewart, 11 S.W.3d 440, 455 (Tex. App.—Houston [14th Dist.] 2000,
pet. denied). The test is whether the request was reasonably necessary to enable a jury
to render a proper verdict. However, if a court's charge fairly and fully presents all
controlling questions, it is not error to refuse to submit additional instructions that are mere
shades or variations of the questions submitted. Carr v. Weiss, 984 S.W.2d 753, 766 (Tex.
App.—Amarillo 1999, pet. denied).
          Even assuming there was some evidence Zinda's eviction was wrongful, we
recognize the jury charge in this case contained a question asking whether the partnership
had failed to comply with the terms of the lease. The jury found the partnership did not fail
to comply. This necessarily covers the issue of whether Zinda was wrongfully evicted
pursuant to the terms of the lease: if Zinda did not prove the partnership failed to comply
with the terms of the lease, then Zinda did not prove the eviction was wrongful. The court
therefore did not err by failing to submit the requested questions. 
          We now turn to Zinda's contention the court should have rendered judgment
notwithstanding the verdict on this issue. Judgment without or against a jury verdict is
proper at any course of the proceedings only when the law does not allow reasonable
jurors to decide otherwise. Accordingly, the test for legal sufficiency is the same for
directed verdicts and judgments notwithstanding the verdict. City of Keller v. Wilson, 168
S.W.3d 802, 823 (Tex. 2005). Under either scope of review, we view the evidence in the
light most favorable to the verdict, crediting favorable evidence if reasonable jurors could,
and disregarding contrary evidence unless reasonable jurors could not. Id. at 807. 
          Zinda argues he conclusively proved the eviction was wrongful—focusing on an
alleged failure to provide ten days' written notice as called for by the lease after he became
delinquent in rental payments. However, the jury had evidence before it that notice was
presented January 28, 2002, that the actual lockout did not occur until April 10, 2002, and
that Zinda did not bring his rent current during that time period. Thus, there is evidence
the procedure was within the scope of the agreement, and no conclusive proof to the
contrary.
          Zinda alternatively contends the partnership did not comply with Tex. Prop. Code
Ann. § 93.002(f) (Vernon 1995) because it did not put a written notice on the restaurant's
front door stating where Zinda could obtain a new key, and that this constitutes a breach,
as a matter of law, that would prevent the partnership from executing the eviction under the
terms of the agreement. The evidence does show that no notice was posted on the
restaurant's front door. Zinda testified, however, that he already had all the information
such a notice would have provided. There is evidence that Zinda was present when the
locks were being changed and that he and the Smiths had a meeting immediately
thereafter to consider their options. Thus, unlike the absentee landlord situation that would
be remedied by the posting of a formal notice on the door, there is no evidence Zinda was
harmed by the failure to so post a notice where all parties were fully involved in the
proceedings leading up to the changing of the locks.
          2. Breach of fiduciary duty 
          Zinda also contends the evidence establishes breach of fiduciary duties to him by
the appellees as a matter of law. Zinda argues it was a breach for the partnership
representatives, the Smiths, to evict him, and for them to contact the Kirls to find out if they
would continue to work there if Zinda was gone. Zinda also argues that, because the
partnership took over the books before eviction, it had the duty to pay rent first from gross
income and thus avoid his ultimate eviction—and that failing to do so was a breach of the
partnership's fiduciary duty to him. Zinda therefore contends the other limited partners
breached that duty by failing to be fully candid with him and failing to disclose their intention
to take over the business, by engaging in self-dealing by contacting the "key" employees
(the Kirls), and by not generally behaving in a manner that put his interests first.
          Fiduciary duties arise as a matter of law in certain formal relationships, including
attorney-client, partnership, and trustee relationships. Ins. Co. of N. Am. v. Morris, 981
S.W.2d 667, 674 (Tex. 1998). The relationship among the various parties was a
partnership; thus, the appellees owed fiduciary duties to Zinda.
          Partners have a duty to one another to make full disclosure of all matters affecting
the partnership and to account for all partnership profits and property. Tex. Rev. Civ. Stat.
Ann. art. 6132b–4.04 (Vernon Supp. 2005); Bohatch v. Butler & Binion, 905 S.W.2d 597,
602 (Tex. App.—Houston [14th Dist.] 1995), aff'd, 977 S.W.2d 543 (Tex. 1998). Partners
owe one another a fiduciary duty, including a strict duty of good faith and candor. 
Brosseau v. Ranzau, 81 S.W.3d 381, 394 (Tex. App.—Beaumont 2002, pet. denied).
          There is evidence the appellees had intended Zinda remain as the manager of the
restaurant. There is also evidence that the Smiths made an interest-free loan to help Zinda
catch up on rent and on unpaid sales taxes, that they encouraged him to stop gambling
and seek help, and that they only ensured he was unable to make draws from the
operating accounts after repeated problems involving the use of funds from that account
for other purposes. The evidence shows that the appellees ensured that operating
expenses (suppliers' invoices) were paid from that account. The evidence also shows that,
despite having sent a notice to Zinda, the appellees did not finally evict Zinda until they
became aware that, in March 2002, the State Comptroller had levied on the business due
to nonpayment of taxes, and that Zinda had been using sales tax receipts for other
purposes. The appellees also learned of Zinda's second payroll tax deficiency with the
Internal Revenue Service and about Zinda's withdrawals from the restaurant's alcoholic
beverage replacement account. 
          Zinda focuses his argument on what he terms as the appellees' failure to clearly
inform him of their intent to take his business, and that, up until the moment they locked
him out of the restaurant, they did not deal honestly with him when they told him they were
still working with him. 
          There is evidence the appellees warned Zinda of the consequences of his conduct
well before they acted to remove him from the partnership. Zinda argues that their actions
thereafter diluted that intent to the point he did not realize he was actually in danger of
eviction. However, the jury had all the evidence, and we cannot say that its conclusion the
appellees had not violated their fiduciary duties is without support. The evidence does
show that the appellees attempted to keep the partnership with Zinda viable for some time,
but also that they finally reached the end of their willingness to find ways to work past
major problems. A responsibility to act as a fiduciary is not equivalent to a responsibility
to forgive and attempt to assist a recalcitrant partner forever, but instead to treat him or her
with utmost fairness. The jury could have concluded from this evidence the appellees had
adequately executed their duties. There is evidence to support the verdict, and there is not
conclusive evidence to the contrary. The contention of error is overruled.
          3. Conversion of the lease and Zinda's personal property
          Zinda next contends he conclusively proved that the result of the wrongful eviction
was the unlawful conversion of his property. As discussed above, there is evidence the
eviction was not wrongful. In that instance, Zinda's argument has no foundation and is
overruled.
          4. Tortious interference with contract
          Zinda next contends the appellees took actions that constituted tortious interference
with his contracts—notes with the White Oak State Bank and the Longview Bank and
Trust—that were related to the purchase of items used in the restaurant. The argument
appears to be that the interference occurred when the partnership did not use proceeds
from the restaurant to pay those notes. The argument is not well developed, and there is
no reference to any particular acts or any citation to the record that might be pursued to
determine the object of this contention. We assume it is directed at the jury's answer of
"No" to questions 5 and 7, in which it was asked whether the appellees had intentionally
interfered with a contract between Zinda and the respective banks. 
          There is evidence the available funds were used to keep the restaurant in operation. 
Keeping the restaurant afloat by paying the businesses that provided its products is
necessary and appropriate. Counsel has directed us to no evidence to show this was done
with intent to interfere with Zinda's notes. There is evidence of other, proper, purposes for
the appellees' behavior. The contention has not been shown to have merit. It is overruled.
Failure To Recover Damages and Attorney's Fees
          Zinda next raises several contentions involving proof of his damages, the correct
amounts thereof, and attorney's fees he should be able to recover because of his
successful presentation of the case on appeal. Based on our resolution of the issues
above, we need not address these contentions.
Appellees' Counterclaims
          1. Past-due rentals and late charges
          Zinda contends a jury finding that he owes $15,675.00 in past-due rentals and late
charges is not supported by sufficient evidence. The argument, however, relies on his
position the appellees had failed to comply with their fiduciary duties—by paying suppliers'
bills before paying on Zinda's rent out of the income stream of the business. Because of
our resolution of those issues against Zinda, we also need not address this argument. 
          2. "Bless Your Heart" property
          Zinda contends the jury's answers to questions finding that Zinda had agreed to pay
Kyle ten percent of the gross revenue received from the sale of a separate "Bless Your
Heart" property is unsupported by the evidence. Zinda bases this contention on his
position that, because a stock exchange between Kyle and himself provided the
consideration for the ten percent, and because only oral evidence of this stock exchange
was introduced, the statute of frauds precludes recovery. Zinda's contention appears to
be that, because, at the time of the oral agreement, there was no time for performance
(i.e., to sell the realty), the oral agreement is unenforceable. He relies on our opinion in
Wiley v. Bertelsen, 770 S.W.2d 878, 882–83 (Tex. App.—Texarkana 1989, no writ), as
authority for his position. 
          In Wiley, we were faced with an argument by a ranch manager that "there was an
oral contract between him and his employers which provided that he was to receive one
third of the proceeds from the ranch and cattle, less their purchase price, when they were
sold." Id. at 880. Several arguments were raised, including the statute of frauds and the
question of the enforceability of an oral contract. We recognized, however, that the statute
of frauds does not apply to an agreement to pay a certain sum of money out of the
proceeds of a future sale of land. Id. at 881 (citing Berne v. Keith, 361 S.W.2d 592 (Tex.
Civ. App.—Houston 1962, writ ref'd n.r.e.)).
          The only remaining question raised by Zinda concerning the statute of frauds is
whether the alleged oral agreement was "an agreement which is not to be performed within
one year from the date of making the agreement." Tex. Bus. & Com. Code Ann. § 26.01
(Vernon Supp. 2005) provides, in pertinent part, the following:
(a) A promise or agreement described in Subsection (b) of this section
is not enforceable unless the promise or agreement, or a memorandum of
it, is
                     (1) in writing; and
                     (2) signed by the person to be charged . . . .
 
(b) Subsection (a) of this section applies to:
                     . . . .
(6) an agreement which is not to be performed within one year from
the date of making the agreement; . . . .

          In Wiley, the ranch manager argued he was required to work for ten years before
the contract became performable. This had the effect of making the oral agreement
unenforceable because it was not to be performed within one year from the date of the
agreement. That does not apply to this case. The evidence indicates the payment was
to be made on the sale of the property, which could have occurred within one year or after
a longer time period. 
          Further, we have recently recognized that partial performance is an exception to the
statute of frauds. Bookout v. Bookout, 165 S.W.3d 904, 907 (Tex. App.—Texarkana 2005,
no pet.); see also Exxon Corp. v. Breezevale Ltd., 82 S.W.3d 429, 439 (Tex. App.—Dallas
2002, pet. denied). The partial performance must be "unequivocally referable to the
agreement and corroborative of the fact that a contract actually was made." Bookout, 165
S.W.3d at 907; Exxon Corp., 82 S.W.3d at 439. Actions relied on to establish the partial
performance exception to the statute of frauds must be such as could have been done with
no other design than to fulfill the particular agreement sought to be enforced; otherwise,
they do not tend to prove the existence of the parol agreement relied on by the plaintiff. 
Bookout, 165 S.W.3d at 907–08; Exxon Corp., 82 S.W.3d at 439–40. 
          In this case, as in our recent opinion in Bookout, an issue on partial performance
was not presented to the jury. As we recognized there, generally, the party claiming an
exception to the statute of frauds must secure a finding to that effect. Barbouti v. Munden,
866 S.W.2d 288, 295 (Tex. App.—Houston [14th Dist.] 1993, writ denied). Its absence
would be fatal to an appellee's counterclaim unless a finding on partial performance is
otherwise implied by law. We reasoned in Bookout that, because the statute of frauds had
been triggered and would bar recovery unless the plaintiff established partial performance
of the contract, partial performance was a condition precedent to, and therefore was
functionally an element of, the breach of contract ground of recovery. 
          As in Bookout, the question of sufficiency of evidence to support an implied finding
of partial performance is before this Court. The evidence is relatively straightforward in that
respect. Kyle testified he had exchanged stock with Zinda in return for the ten percent
interest in income from the "Bless Your Heart" property, and for ten percent of any sale of
that property. That evidence is not controverted and clearly shows a partial performance
of the agreement. The implied finding of partial performance is supported by the evidence,
so the contract is enforceable.
          3. Foreclosure
          Zinda contends the foreclosure judgment on his partnership interest is a nullity that
must be set aside. His contention is based on the underlying argument that, rather than
selling the restaurant property, the partnership should have wound up the partnership's
affairs. That matter does not appear to have been raised at trial, other than possibly in an
objection Zinda made to the admission into evidence of a copy of the deed of trust covering
the restaurant property. In his last amended answer, Zinda pled that "[a] deed of trust does
not give a valid lien on a personal property partnership interest," and he now attempts to
apply that language in his appellate arguments.
          It appears Zinda is arguing that the vehicle of foreclosure was not the right one to
use. However, he fails to specify why this is true, other than arguing that a deed of trust
from him to the partnership cannot be used to authorize sale of the property by the
partnership. But, Zinda also states the partnership owns all tangible partnership property. 
          The judgment is in the nature of an order of accounting. It foreclosed the Smiths'
security interest in Zinda's limited partnership interest, and the order directed the seizure
and sale of any available collateral. This is in accordance with the terms of the "Deed of
Trust, Security Agreement & Financing Statement," whereby Zinda gave to the Smiths a
deed of trust to his 18.92% interest in the partnership to secure all his indebtedness to
them. Although Zinda suggests the foreclosure was of the real estate, that is not precisely
correct—it was of his interest in the partnership. 
          When read in that light, Zinda's argument is not persuasive because the document
partially entitled as the "Deed of Trust" is actually much more than a real property device
in this instance. 
Improper Evidence
          Zinda next contends evidence was erroneously admitted at trial. He does not
specify which evidence, but states, "Their counsel emphasizes the poisonous matters in
his closing argument." He argues that the "poisonous" evidence necessarily resulted in an
improper judgment. It appears Zinda is referring to evidence of his gambling, options
trading, and misuse of money from the sales tax and payroll tax accounts. He suggests
that, because his motion in limine was overruled, his contention is properly before us. That
evidence, however, was initially brought out in his own testimony on direct examination by
his own counsel. 
          Because a trial court's ruling on a motion in limine preserves nothing for review, a
party must object at trial when the testimony is offered in order to preserve error for
appellate review. Hartford Accident & Indem. Co. v. McCardell, 369 S.W.2d 331, 335 (Tex.
1963); Greenberg Traurig of New York, P.C. v. Moody, 161 S.W.3d 56, 91 (Tex.
App.—Houston [14th Dist.] 2004, no pet.).
          In this case, Zinda did not object to the admission of the evidence at trial and, in
fact, propounded it himself. The claim of error has not been preserved for appellate
review.
Simulated Transaction Instruction
          Zinda contends the court erred by failing to charge the jury on the concept of a sham
transaction. He contends this is the type of transaction in which the partnership engaged
by first paying vendors instead of paying rent. In his trial amendment, Zinda alleged that
the "simulated transactions" of the defendants nullified and voided his lockout and eviction
by them. 
          After examining the mass filing of proposed jury questions and instructions, it does
not appear Zinda requested a question or instruction on that topic. Thus, the failure to
submit such a question is not error. Tex. R. Civ. P. 278.
Commercial Bribery and Theft 
          Zinda also contends the court erred by failing to charge the jury on the questions of
commercial bribery and theft. Rule 278 of the Rules of Procedure requires the court to
submit questions raised "by the written pleadings and the evidence." Tex. R. Civ. P. 278. 
As pointed out by the appellees, the issues of commercial bribery and theft were not pled. 
Thus, no error is shown.



Malice and Exemplary Damages
          The malice issue was pled and a draft question was provided by Zinda. The court
declined to submit the issue and had, in fact, rendered a directed verdict against Zinda on
that issue. Zinda contends this was error because there was some evidence of malice. 
In support, Zinda focuses on the discussions the appellees had with key restaurant
employees before the lockout, the lockout itself, and Zinda's perception that the appellees
deceived him by telling him, right up to the moment they locked him out, that they were
trying to help him. 
          Under current law, "malice" is defined as "a specific intent by the defendant to cause
substantial injury or harm to the claimant." Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7)
(Vernon Supp. 2005); Clayton v. Wisener, No. 12-03-00251-CV, 2005 Tex. App. LEXIS
4543, at *26 (Tex. App.—Tyler June 15, 2005, no pet. h.). Even under the most liberal
construction of this evidence, it does not show "a specific intent to cause substantial injury
or harm." Under a directed verdict review, we look to see if there is some evidence to the
contrary. In this case, we find none. Thus, the court's granting of a directed verdict on the
issue of malice was proper.
          Further, the issue of malice is pertinent to Zinda's attempt to recover exemplary
damages. The jury determined Zinda was not due any actual damages. Therefore,
exemplary damages were not available, and even if error existed, it would necessarily be
harmless. See Tex. Civ. Prac. & Rem. Code Ann. § 41.004(a) (Vernon Supp. 2005).
Summary and Conclusion
          In summary, the trial court did not commit error in its granting of directed verdict or
in its denial of Zinda's motion for judgment notwithstanding the verdict; Zinda was not
entitled to the recovery of damages or attorney's fees; judgment on the appellees'
counterclaims was proper; evidence of Zinda's gambling, options trading, and misuse of
money was proper; and no error is shown in the trial court's failure to charge the jury on
simulated transactions, commercial bribery, theft, or malice.
          For these reasons, we affirm the judgment.



                                                                           Donald R. Ross
                                                                           Justice 
 
Date Submitted:      October 5, 2005
Date Decided:         November 9, 2005